UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
ANTHONY PETRELLO, CYNTHIA
PETRELLO,

                Plaintiffs,

       - against -

JOHN C. WHITE, JR., WHITE INVESTMENT
REALTY, LP.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**

01-CV-3082 (DRH) (MLO)

**A P P E A R A N C E S :**

**BERG & ANDROPHY**
Attorneys for Plaintiffs
230 Park Avenue, Suite 1000
New York, New York 10169
By: David H. Berg, Esq., Gabriel Berg, Esq.

**GREENBERG TRAURIG, LLP**
Attorneys for Defendants
200 Park Avenue
New York, New York 10166
By: Brian S. Cousin, Esq.

**HURLEY, District Judge:**

*INTRODUCTION*

       Presently before the Court are the motions by Plaintiffs Anthony Petrello ("Petrello") and

Cynthia Petrello (collectively, "Plaintiffs") for summary judgment and Defendants John C. White,

Jr. ("White"), and White Investment Limited Partnership[1] (collectively, "Defendants") for judgment

as a matter of law and leave to amend counterclaims. Originally before the Honorable Leonard D.

---

      [1]Defendant White Investment Realty, Ltd. was named in error in the Complaint. (*See*
Am. Answer ¶ 22.)

Wexler, Senior District Judge for the Eastern District of New York, the parties entered into a settlement agreement on May 30, 2003. The settlement agreement was only in effect for nine months. As was his option, Petrello elected not to extend the agreement. The parties returned to court, and, after Judge Wexler recused himself, the case was reassigned here. Neither party seeks enforcement of the settlement agreement, but rather both parties have resumed their initial claims.

For the reasons stated below, the Court GRANTS Plaintiffs' motion for summary judgment, DENIES Defendants' motion for judgment as a matter of law, DENIES Defendants leave to amend as to the sixth counterclaim, and GRANTS Defendants leave to amend as to the seventh and eighth counterclaims.

*BACKGROUND*

The material facts, drawn from the parties' Local 56.1 Statements and submitted evidence, are undisputed unless otherwise noted. Plaintiffs are residents of Houston, Texas. Petrello was a partner at Baker & McKenzie ("Baker") until 1991 when he took a position as legal counsel for Nabors Industries in Houston. He remained "Of Counsel" at Baker from 1991 to 2000. White is a resident of the Hamlet of Sagaponack, in the Town of Southampton, New York, where he owns a fifty-seven-acre farm. Defendant White Investment Limited Partnership is a limited partnership formed by the White family, including White and his son, Jeff White, to protect the family's financial interests and keep the farm within the family.

## I.    White's Estate Planning (1980's - July 1995)

White's family has owned the farm for nearly 300 years. Fearing that his children would be unable to pay the estate taxes for the increasingly valuable property, White began dealing with estate planning issues in the 1980's. White decided to subdivide his "Homelot." To do so, he

sought the assistance of Richard Halsey ("Halsey"), President of the Peconic Land Trust ("PLT"), Richard Warren, a principal of Inter-Science Research Associates, Inc., an environmental and land-development consulting firm, and Dolliver Associates, a surveying firm, to begin preparing subdivision maps and related materials.

The White family retained the services of the PLT to prepare and implement a conservation plan for estate tax purposes. In 1993, Halsey referred the family to Philip G. Hull, Esq. ("Hull"), of the law firm Winthrop Stimson ("Winthrop"), who concluded that an effective estate plan would involve a charitable donation to the PLT and the sale of some oceanfront property. The end result would be that the family could maintain most of its property while raising enough cash to cover anticipated estate taxes.

## II. Petrello and White Negotiate Land Purchase (July 1995 - February 1998)

Michael Burrows ("Burrows") introduced Petrello to White. Burrows was White's longtime friend and a partner at Baker with Petrello. White had a number of cottages on the property that he rented during the summer months. After the introduction, Petrello became a seasonal visitor, renting a summer cottage with his wife from 1992 to 1997.

During one of his visits, Petrello approached White about purchasing a portion of the Homelot. Petrello proposed a deal: if White would sell a portion of his property to Petrello, Petrello would pay all of the land planning and legal work required to subdivide the property and employ Baker attorneys to develop a complete estate plan for the Whites. Petrello offered White two million dollars for 10.59 acres of land. On August 25, 1995, both parties signed the Memorandum of Sale, which included all of these terms. (*See* Pls.' Summ. J. Mem., Ex. A-17.)

Three days later, the parties signed an addendum, wherein Petrello agreed to hire Baker to complete an estate plan for White at no cost to White.

As of late August 1995, Hull was no longer handling the White family's estate planning. After execution of the Memorandum of Sale, Robert Dumont, Esq. ("Dumont"), an estate-planning attorney at Baker, went to White's house for a meeting with the family, Burrows, and Halsey. On November 3, 1995, Dumont provided a letter to White outlining an estate plan. In December, Halsey contacted William Hutton, Esq., to discuss the estate plan and strategy conceived by Dumont.

In August 1997, Dumont drafted living wills and revocable trust documents for the White family. The documents drafted by Dumont replaced similar documents drafted earlier by Hull of Winthrop.

### III.    Contract of Sale (February 1998 - June 2000)

By February 1998, nearly three years after the signing of the Memorandum of Sale, the parties prepared to sign the Contract of Sale. At the recommendation of the PLT, in or about February 1998, White retained P. Edward Reale, Esq. ("Reale"), of Twomey, Latham, Shea & Kelley ("Twomey"), to draft the Contract of Sale and the rider thereto. Reale was listed as the attorney for seller on the Contract. At about the same time, Jay Quartararo, Esq., also of Twomey, took over the Whites' estate planning. Dumont was no longer involved with the White family's estate planning.

On April 13, 1998, Reale circulated a draft of the Contract of Sale, which he had prepared, to the parties. The terms of the Contract of Sale were different from those of the Memorandum of Sale. According to the terms of the contract, White would sell Lots 4, 5, and 6,

totaling 9.56 acres, to Petrello for a purchase price of $2.1 million.  That amount was $100,000 more than the purchase price in the Memorandum of Sale for one less acre of land.  The Contract of Sale also contained a merger clause that read:

> All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract: it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(Pls.' Summ. J. Mem., Ex. A-1 ¶ 28(a).)  The contract further acknowledged that Petrello had paid $355,000 toward the purchase price as of August 1998 and provided that $170,000 was due at closing.

Petrello returned the signed contract to Reale on July 31, 1998.  White signed the contract on August 21, 1998, in the presence of Reale.  Reale sent the fully-signed contract to Petrello with a cover letter dated September 4, 1998.

## IV.    White Refuses to Close (June 2000 - May 2001)

In June 2000, White's land was reappraised.  Since the beginning of his estate planning, the price of real estate had skyrocketed and he determined that he would need between $8 and $10 million to cover potential estate taxes rather than $2 million, as originally thought.  According to the new appraisal, the land at issue was worth between $14.5 and $16 million.

On October 26, 2000, Reale sent Petrello a full set of closing documents.  Petrello signed the closing documents and returned them to Reale on November 14, 2000.  White refused to sign the documents.  Reale sent Petrello a second set on April 10, 2001, which were returned signed by Petrello on April 25, 2001.  White again refused to sign.

As a result of White's refusals, Petrello filed the present complaint on May 15, 2001, demanding, *inter alia*, specific performance of the Contract of Sale and damages for White's delays in closing the sale. (*See generally* Supplemental & Am. Compl.) White answered on July 9, 2001, asserting eighteen affirmative defenses (*see* Am. Answer to the Supplemental & Am. Compl. with Affirmative Defenses ("Am. Answer"), ¶¶47-64)[2], and the following counterclaims: (1) common law fraud; (2) fraud in the inducement; (3) breach of fiduciary duty; (4) breach of constructive trust; and (5) declaratory judgment that the Contract of Sale is null and void. (*See* Am. Answer, ¶¶183-214.) As previously noted, the case was initially assigned to Judge Wexler.

## V.    Procedural History (May 2003 - February 2004)

On May 30, 2003, after three days of trial, the parties agreed to settle. In the settlement agreement, the parties had nine months to resolve any development issues with the Town of Southhampton. If the settlement agreement was not completed within the nine month time-frame, then Petrello could terminate the agreement at his election.

Each party disputed various actions by the other over the subsequent nine months. For example, Petrello took four months to provide the required documents to White. On September 30, 2003, when Petrello finally delivered the new lot map to White, White objected to the drawing of the access road. Judge Wexler appointed a Special Master to determine issues

---

[2]The affirmative defenses are as follows: (1) failure to state a claim; (2) the doctrine of unclean hands; (3) fraudulent inducement; (4) lack of consideration; (5) unconscionability; (6) Petrello's failure to perform; (7) estoppel; (8) the doctrine of waiver; (9) invalidity because the contract was not negotiated at arm's length; (10) the Statute of Frauds; (11) the doctrine of *in pari delicto*; (12) breach of fiduciary duty; (13) unenforceability; (14) the doctrine of ratification, confirmation and acquiescence; (15) violation of oral trust agreement; (16) unreasonable expenditures; (17) failure to mitigate; and (18) no meeting of the minds. The majority of these defenses, *i.e.* numbers one, two, four, seven, eight, ten, eleven, fourteen, sixteen, seventeen, and eighteen, play no part in this decision as they were not argued by White.

regarding the settlement agreement, *e.g.* the location of the access road. With regard to the access road, the Special Master decided on January 6, 2004, that the decision should be left to the town.

By the time Petrello finally submitted the project documents to the Town of Southampton, it was the beginning of February. As a result, the town did not approve the plans by the end of the nine-month time frame. Petrello elected not to extend the term of the settlement agreement.

The suit returned to federal court. For reasons not presently relevant, Judge Wexler recused himself. Thereupon, the case was reassigned to this Court. Petrello filed a Motion for Summary Judgment, demanding specific performance of the August 25, 1998 Contract of Sale. (*See* Pls.' Summ. J. Mem.) White opposed the motion, arguing for either rescission of the Contract of Sale or the imposition of a constructive trust. (*See* Defs.'Opp'n Mem.) Petrello filed a reply. (*See* Pls.' Reply Mem.) Not long thereafter, White filed a Motion for Judgment as a Matter of Law ("JMOL"), as to Petrello's request for specific performance, and sought leave to amend the answer to add three new counterclaims.[3] (*See* Defs.' Mem. for JMOL.) Petrello opposed the motions and White filed a reply. (*See* Pls.' Opp'n Mem.; Defs.' Reply Mem.)

---

[3]Normally, the Court would address leave to amend prior to deciding the motions for summary judgment and JMOL. As discussed *infra* Part V, however, though the new counterclaims involve the settlement agreement, White does not request enforcement of the settlement agreement. Instead, White merely requests costs and attorneys' fees regarding Petrello's alleged bad faith in the procurement of the settlement agreement. Consequently, the new counterclaims have no bearing upon the substance of Petrello's claims, and are a secondary matter.

*STANDARDS*

The standards for JMOL and summary judgment are the same.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)); *Kerman v. City of New York*, 374 F.3d 93, 118 (2d Cir. 2004) ("The standard for judgment as a matter of law is the same as the standard for summary judgment."); *Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993) (holding that "whether there are fact issues that should be decided only by the jury, the same standard that applies to a pretrial motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50").  Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Fed. R. Civ. P. 56(c)).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those materials "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has offered some evidence that no genuine issue of material fact remains to be tried, the burden shifts to the non-moving party to provide similar evidence indicating that a genuine, triable issue remains.  *Anderson*, 477 U.S. at 250;  Fed. R. Civ. P. 56(e).  Affidavits submitted in opposition to summary judgment must be based on personal

knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55.

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). Nevertheless, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1998). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

## DISCUSSION

Petrello's motion for summary judgment demands specific performance of the August 25, 1998 Contract of Sale and attempts to rebuff each of White's counterclaims. In opposition, White

argues that Petrello breached his fiduciary duty to White, and fraudulently induced White into the Contract of Sale, thereby warranting rescission of the Contract of Sale. Should the Court disagree and grant specific performance to Petrello, White argues that "a constructive trust in [his] favor [should be imposed] on the land originally included in the North Lot." (Defs' Opp'n Mem. at 17.) White complements his opposition with a Motion for JMOL. White argues that he is entitled to a directed verdict regarding Petrello's specific performance request, and that Petrello acted in bad faith regarding the settlement agreement. (*See* Defs.' Mem. for JMOL at 1.) Petrello opposes the motion.

## I._____Breach of Fiduciary Duty

Petrello argues that White's affirmative defenses and counterclaims based upon allegations of breach of fiduciary duty should be dismissed because Petrello owed White no legal duty separate from his duty to perform under the contract. (*See* Pls.' Summ. J. Mem. at 12.) White counters that whether Petrello owed said duty to White is a genuine issue of material fact. (*See* Defs.' Opp'n Mem. at 1.)

### A.       Governing Legal Principles

"[W]here a fiduciary relationship exists between parties, transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake or undue influence." *Sepulveda v. Aviles*, 762 N.Y.S.2d 358, 363 (1st Dep't 2003).

A fiduciary relationship arises "where one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relations." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (citing *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (1st Dep't 1987)); *Suthers v. Amgen, Inc.*, 372 F. Supp. 2d 416, 426-

27 (S.D.N.Y. 2005). "[P]laintiffs must allege some factors from which a court could conclude that such a relationship has been established." *Boley v. Pineloch Assoc., Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y.1988). Beyond what may be memorialized in writing, a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge. *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (1ˢᵗ Dep't 1998). In New York, no fiduciary relationship exists where parties were acting and contracting at arms-length to a business transaction. *See In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 626 (Bankr. S.D.N.Y. 2002); *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F. Supp. 770, 772 (S.D.N.Y. 1985); *see also Oursler v. Women's Interart Ctr. Inc.*, 566 N.Y.S.2d 295 (1st Dep't 1991) (stating that "[a] conventional business relationship, without more, does not become a fiduciary relationship by mere allegation"). The existence of a fiduciary duty is fact-specific to each case. *See Sonnenschein v. Douglas Elliman-Gibbons & Ives*, 713 N.Y.S.2d 9 (1st Dep't 2000).

**B.      Application to the Present Case**

Petrello moves for summary judgment as to all claims involving fiduciary duties, claiming that he never stood as White's fiduciary. (*See* Pls.' Summ. J. Mem. at 19-23.) In opposition, White argues that "a fiduciary relationship existed between Mr. Petrello and John White by virtue of Mr. Petrello's having provided legal estate planning and subdivision advice to John White and his family." (Defs.' Opp'n Mem. at 2.) White continues, "By providing legal estate planning and subdivision advice to John White, while being on the opposite side of a real estate transaction, Mr. Petrello breached his fiduciary duty to Mr. White." (*Id.*) Specifically, White maintains that by enlisting an attorney from Baker to aid in the preparation of the estate

-11-

plan and by personally reviewing White's legal documents, Petrello owed White the fiduciary duty that flows from the attorney-client relationship. (*See*, *e.g.*, Defs.' Opp'n Mem. at 4 ("[T]here is a genuine issue of fact as to whether Mr. Petrello assisted in the preparation of these three additional legal/estate planning documents for the Whites.") *and id*. at 5 ("Assuming that Mr. Petrello was both John White's attorney with respect to either the estate planning or the subdivision . . . and counterpart in the transaction, Mr. Petrello breached his fiduciary duties owed to John White.").) White further contends that Petrello, by entering into a business transaction with an alleged client, was self-dealing in violation of his ethical duties as an attorney. (*See id* at 2.)

As Justice Bellacosa wrote in *Matter of Cooperman*, 83 N.Y.2d 465 (1994):

Sir Francis Bacon observed, "[t]he greatest trust between [people] is the trust of giving counsel." This unique fiduciary reliance, stemming from people hiring attorneys to exercise professional judgment on a client's behalf-"giving counsel"-is imbued with ultimate trust and confidence. The attorney's obligations, therefore, transcend those prevailing in the commercial market place. The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interests over the lawyer's.

83 N.Y.2d 471-72 (citations omitted). Clearly, the relationship is near-sacred and must be entered felicitously. Thus, "[u]nder New York law, parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree." *Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000).

The law in the Second Circuit is unambiguous: a party opposing summary judgment cannot create a triable issue by using post-deposition declarations to contradict a previously sworn statement. *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004). White, his

son, and Michael Burrows all testified at their depositions that Petrello was never White's attorney. (*See* Pls.' Summ. J. Mem., Ex. B-27 (Plaintiffs' Attorney: "Was [Petrello] ever your attorney?" White: " I don't know in any respect that he was."); *id*. at Ex. B-28 (Plaintiffs' Attorney: "[D]id you ever tell anybody that Tony Petrello was your attorney?" Jeff White: "I don't know why I would tell anyone he was our attorney if he wasn't our attorney."); *and id*. at Ex. B-29 (Plaintiffs' Attorney: "Was [Petrello] counsel to any member of the White family?" Michael Burrows: "No.").) Furthermore, White did not submit any evidence suggesting that White retained Petrello as his attorney, that White ever paid Petrello attorney fees, or that White terminated Petrello as his attorney. Thus, despite White's current assertions to the contrary, the evidence is clear that an attorney-client relationship never existed between Petrello and White.[4]

In fact, Reale, and not Petrello, was White's attorney with regard to the Contract of Sale. Reale not only drafted the Contract of Sale, but Reale also testified that he attempted to add provisions into the Contract of Sale regarding the alleged oral agreements. (*See* Pls.' Summ. J. Mem., Ex. B-40 (testifying that he unsuccessfully negotiated with Petrello to add a paragraph granting White "architectural approval").) Thus, the evidence establishes that Petrello was not White's attorney, and that Reale was.

The Court also notes that fiduciary duties do not arise solely because one party has expertise that is superior to another. *See Boley v. Pineloch Assoc., Inc.*, 700 F. Supp. 673, 681 (S.D.N.Y.1988) (holding that "[a]llegations of reliance on another party with superior expertise,

_____

[4]White also alleges that Petrello reviewed several documents, but merely reviewing those documents does not raise Petrello's involvement with the White family to the level of attorney-client. White also cites to the PLT's belief that Petrello was the White family's "advisor," but that belief is similarly insufficient as a matter of law to establish the attorney-client relationship.

standing by themselves, will not suffice").  Though there is evidence of Petrello's superior

expertise in legal matters, there is no further evidence that would support the conclusion that

Petrello and White stood in a fiduciary relationship to one another.[5]

Finally, as to New York's disciplinary rules, White argues at length that it is unethical for

an attorney to enter into this type of financial transaction with his client.  (*See* Defs.' Opp'n

Mem. at 5-9.)[6]  Assuming, *arguendo*, that is true, "[t]he violation of a disciplinary rule does not,

without more, generate a cause of action."  *Schwartz v. Olshan Grundman Frome & Rosenzweig*,

753 N.Y.S.2d 482, 487 (1st Dep't 2003).  As a result, White's assertions and citations to the New

York disciplinary rules are insufficient, standing alone, to establish a violation of fiduciary duty.

Furthermore, because no reasonable trier of fact could find on the record that Petrello was

White's attorney, the discussion of the disciplinary rules is of no moment.

In sum, it is clear that Petrello never owed White any fiduciary duty.  Because there is no

issue of material fact, the Court grants Plaintiffs' motion for summary judgment regarding

Defendants' Third Counterclaim.

**II.      Fraud**

Petrello seeks summary judgment as to White's counterclaims of common law fraud and

fraud in the inducement of the Contract of Sale, *i.e.* Counterclaims One and Two.  (*See* Pls.'

---

[5]White alleges that Petrello was his fiduciary because Petrello was in possession of confidential information about White's assets, financial condition, and estate planning.  Again, White provides no case law to support a conclusion that mere knowledge of these private matters generates fiduciary duties.  (*See* Defs.' Opp'n Mem. at 2.)

[6]"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless the client has consented after full disclosure."  N.Y. JUD. LAW § 1200.23(a) (McKinney's 1992).

Summ. J. Mem. at 13-19.)  White does not counter Petrello's arguments regarding common law

fraud, instead focusing his efforts on the fraud in the inducement claim and an allegation of

constructive fraud.

### A.        Fraud in the Inducement

As a preliminary matter, Petrello argues that where "the written provisions of a contract

contradict the alleged oral representations, there can be no reasonable reliance as a matter of

law." (Pls.' Reply Mem. at 7.)[7]   Petrello's argument does not preclude the Court's consideration

of White's fraud in the inducement claim, however, because the introduction of extrinsic

evidence with regard to a fraud in the inducement claim is a well-known exception to the parol

evidence rule.  *See Sabo v. Delman,* 3 N.Y.2d 155, 161 (1957); *Altomare v. Balnir, Inc.*, 765

N.Y.S.2d 870 (1st Dep't 2003) ("[I]t is well settled that a general merger clause does not bar

extrinsic evidence of a fraudulent misrepresentation.").  With that in mind, the Court proceeds to

the more substantive aspects of Petrello's motion.

Petrello moves for summary judgment dismissing White's claims of fraud in the

inducement of the Contract of Sale.  (*See* Pls.' Summ. J. Mem. at 15-19.)  White opposes the

motion, arguing that he only entered into the contract because of the material misrepresentations

by Petrello.  (*See* Defs.' Opp'n Mem. at 9-14.)

A cause of action based upon fraud must be pled with particularity.  *See* Fed. R. Civ. P.

9(b); *see also Kaufman v. Cohen*, 760 N.Y.S.2d 157 (1st Dep't 1998).   To prove fraudulent

---

[7]Petrello further argues that the Court should dismiss White's fraud claims because "a
fraud claim will not lie if it arises out of the same facts as plaintiff's breach of contract claim."
(Pls.' Summ. J. Mem. at 12 (citing *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d
Cir. 2000)).)  White, however, never claims breach of contract.

inducement, White must show: (1) that Petrello made a representation; (2) as to a material existing fact; (3) which was false; (4) and known to be false by Petrello; (5) that the representation was made for the purpose of inducing White to rely upon it; (6) that White reasonably did so rely; (7) in ignorance of its falsity; (8) to his injury. *See The Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 265 (S.D.N.Y. 2005).

Petrello makes a number of arguments to rebuff White's allegations of fraud. Petrello first argues that because White accepted the benefits of the contract, he cannot subsequently claim fraud in the inducement. (*See* Pls.' Summ. J. Mem. at 18.) "[A] party may not avoid an agreement on grounds of fraud if, after acquiring knowledge of the fraud, he affirms the contract by accepting a benefit under it." *Agristor Leasing-II v. Pangburn*, 557 N.Y.S.2d 183, 185 (4th Dep't 1990) (involving counterclaim for fraud in the inducement); *see also Barrier Systems, Inc. v. A.F.C. Enters., Inc.*, 694 N.Y.S.2d 440, 442 (2d Dep't 1999). Yet, "[u]pon discovering fraud, a purchaser . . . may retain the property and seek recovery of damages deriving from the fraud." *Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*, 453 N.Y.S.2d 750, 754 (2d Dep't 1982); *see also Big Apple Car, Inc. v. City of New York*, 611 N.Y.S.2d 533, 534 (1st Dep't 1994) ("[I]t is well settled that a defrauded party to a contract may elect to either disaffirm the contract by a prompt rescission or stand on the contract and thereafter maintain an action at law for damages attributable to the fraud."); *Potts v. Lambie*, 122 N.Y.S. 935, 937 (1st Dep't 1910) ("The mere fact, however, of affirming or ratifying the contract by deciding to retain its fruits, as distinguished from approving of the fraud and deceit and waiving any right to redress on account thereof, is insufficient to show a waiver of the cause of action for damages."). In short, ratification does not preempt a claim for damages arising from the fraud. As such, despite his

ratification of the contract by accepting payments from Petrello, White would be entitled to damages arising from fraud if he could prove that such fraud in the inducement occurred and that he was damaged thereby.

Petrello next argues that White could not have "reasonably relied" on the alleged oral agreements. (*See* Pls.' Summ. J. Mem. at 15.) A key element to a fraudulent inducement claim is detrimental reliance, *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403 (1958), but that reliance must be reasonable or justifiable. *See Bando v. Achenbaum*, 651 N.Y.S.2d 74, 76 (2d Dep't 1996) ("[A] party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."); *First Nationwide Bank v. 965 Amsterdam, Inc.*, 623 N.Y.S.2d 200 (1st Dep't 1995); *cf. Boothe v. Alpha Dev. Corp.*, 789 N.Y.S.2d 269, 270 (2d Dep't 2005) ("With respect to a contract for the sale of real property, unless the facts allegedly misrepresented involved matters peculiarly within one party's knowledge, the other party must make use of the means available to learn, by the exercise of ordinary intelligence, the truth of such matters or he or she will not be heard to complain that he or she was induced to enter into a transaction by such misrepresentations.").

White alleges a number of purported misrepresentations: Petrello told White he would build a small and tasteful house; Petrello promised that the transaction would be done to solve White's estate tax problems; Petrello promised he would sell four acres back to White at farmland prices; and Petrello promised that the transaction would be a "friendly deal" whereby each side would work cooperatively with the other to resolve any problems prior to closing. (*See* Defs.' Opp'n Mem. at 9-10.) White further alleges that he relied on these misrepresentations in signing the Contract of Sale, and has already passed up opportunities to sell lots to others.

The alleged misrepresentations occurred, however, during a period of on-going negotiation. These misrepresentations allegedly took place at the signing of the Memorandum of Sale in August 1995. The final Contract of Sale was not signed, however, until April 1998, nearly three years later. During that time, the purchase price increased by $100,000, and the lot size decreased from a 10.59 acre tract to a 9.56 acre tract. (*Compare* Pls.' Summ. J. Mem., Ex. A-17 *to* Pls.' Summ. J. Mem., Ex. A-1.) As a result, it is difficult to imagine how reliance upon alleged oral agreements that were made during the nascent stages of an evolving transaction can be considered reasonable.

White's reliance upon the alleged misrepresentations is ultimately unreasonable, however, because under New York law, a fraud claim will not be sustained where the party making such claim relied on an independent investigation of its own lawyer. *Arnold Constable Corp. v. Chase Manhattan Mortg. & Realty Trust*, 398 N.Y.S.2d 422, 423 (1st Dep't 1977); *see also Zuyder Zee Land Corp. v. Broadmain Bldg. Co.,* 86 N.Y.S.2d 827, 829 (N.Y. Sup. Ct. 1949) ("There could be no reliance by plaintiff as a matter of law and there was in fact no reliance by plaintiff upon the schedule and the alleged representations, since the lease itself was exhibited to and examined by its officers and attorney, upon whose judgment plaintiff relied."). Reale, White's attorney from at least February 1998 and with regard to the Contract of Sale (*See* Pls.' Summ. J. Mem., Ex. A-1), testified at deposition that he notified White that the contract contained no provisions regarding the alleged oral promises. Reale explained to the Whites that "the issues regarding Tony Petrello's promise, and his agreements to . . . make . . . a conservation easement over Lot Four and reconvey the property, were not in the written agreements. . . . I explained to them that it would make it more difficult to enforce." (Pls.' Summ. J. Mem., Ex. B-

-18-

45; *see also id.* at Ex. B-44 (Reale: "I advised them that it would be easier to enforce were it in writing.").) According to Reale, White said that he trusted Petrello and that the oral agreements were purposefully omitted from the Contract of Sale. (*See* Pls.' Summ. J. Mem., Ex. B-44 ("The family and Mike Burrows had full faith in Mr. Petrello that he would perform that part of his agreement [relating to the reconveyance].").) Because Reale performed an independent investigation and provided sound counsel and White ignored that counsel, White cannot contend that his reliance upon Petrello's representations was reasonable. Moreover, the Contract of Sale, as discussed *infra* at Part III, contains a merger clause that explicitly states that there are no agreements between the parties outside of the written agreement. Under the circumstances, White's purported reliance on the prior oral representations of Petrello was not reasonable as a matter of law.

As Justice Field once wrote, "If, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another." *Slaughter's Adm'r v. Gerson*, 80 U.S. 379, 383 (1871). Here, White maintains he was misled by overconfidence in the claimed statements of Petrello. Not only does Petrello deny that these statements were ever made, but Reale alerted White as to White's overconfidence and White rebuffed Reale's counsel. As a result, White is simply complaining that he suffered from his own voluntary blindness. Such a complaint is not grounds for rescission of a contract freely entered.

Because any reliance upon the alleged misrepresentations would have been unreasonable, the Court grants Plaintiffs' motion for summary judgment as to the fraud in the inducement claim.

### B.     Constructive Fraud

Counterclaim One is a claim for common law fraud, but White argues that the contract should be rescinded because of *constructive fraud*.  (*See* Defs.' Opp'n Mem. at 17.)  Petrello counters that because a fiduciary relationship is an essential element of a constructive fraud claim, White's claim for constructive fraud must be dismissed.  (*See* Pls.' Reply Mem. at 10.)

Under New York law, in order to establish a claim for constructive fraud, a party must establish the same elements as a claim for fraud, except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties.  *See Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 438 (S.D.N.Y. 2002) (citing *Klembczyk v. Di Nardo*, 705 N.Y.S.2d 743, 744 (4th Dep't 1999)).  As discussed *supra*, it is clear that no fiduciary relationship ever existed between White and Petrello.  As a result, there is no basis for White's constructive fraud claim.[8]

_____

[8]White relies almost exclusively upon *Matter of Henderson*, 80 N.Y.2d 388 (1992). (*See* Defs.' Opp'n Mem. at 20.)  In *Henderson*, the Court of Appeals of New York denied summary judgment on fraud and undue influence claims in a suit involving an attorney who was the beneficiary of his client's will.  *See id.* at 390-91.  The client hired another attorney to draft the will to avoid any appearances of impropriety, but the attorney-beneficiary drafted a four-page memorandum discussing how the will should be prepared.  *See id.* at 391.  The newly-hired attorney prepared the will based upon the attorney-beneficiary's four-page memorandum, instead of performing an independent review of the client's personal situation.  *See id.* at 393-94.  The court held, "While most attorneys exercise that power with scrupulous honesty, the risk of undue persuasion is sufficiently substantial as to justify judicial inquiry, at least where, as here, there may have been no meaningful consultation or intervention by independent counsel." *Id.* at 394.

*Henderson* is clearly distinguishable, however, because the attorney-beneficiary in *Henderson* was the retained counsel of the client.  As already discussed, Petrello was never

In sum, the claim for fraud in the inducement fails because White's reliance was unreasonable, and the claim for constructive fraud fails because of the lack of a fiduciary relationship. As a result, the Court grants Petrello's motion for summary judgment as to the First and Second Counterclaims. And, absent a breach of fiduciary duty or fraud, there is similarly no basis for rescission of the contract, thereby dispensing of White's Fifth Counterclaim, seeking declaratory judgment that the contract is null and void.

## III.     The Contract Is an Integrated Agreement

Turning to the Contract of Sale, Petrello argues that the terms of the contract are unambiguous and must be enforced as a matter of law. (*See* Pls.' Summ. J. Mem. at 14.) White proffers no counter argument beyond his claims of fraud or breach of fiduciary duty.

In considering the terms of the contract, the Court employs a three-step inquiry: (1) determine whether the written contract is an integrated agreement; (2) if it is, determine whether the language of the written contract is clear; and, (3) if the language is clear, apply that clear language. *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 397, 412 (S.D.N.Y. 2003) (citation and internal quotation marks omitted). "'[U]nder New York law, a contract which appears complete on its face is an integrated agreement as a matter of law.'" *Mun. Capital Appreciation Partners, I, L.P. v. Page*, 181 F. Supp. 2d 379, 392 (S.D.N.Y. 2002) (quoting *Battery Steamship Corp. v. Refineria Panama, S. A.*, 513 F.2d 735, 738 n.3 (2d Cir. 1975) (citing *Higgs v. De Maziroff*, 263 N.Y. 473, 478 (1934)).

First, the contract contains a merger clause that reads:

---

White's retained counsel. Consequently, *Henderson* is inapposite as its holding is limited to those situations where a fiduciary relationship has already been established.

> All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract: it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(Pls.' Summ. J. Mem., Ex. A-1 ¶ 28.)  Thus, the contract is an integrated agreement.  Because White's fraud claims have no merit, the contract speaks for itself.

There is no dispute between the parties as to the contract language.  It conveys "Tax Map Designation: portion of 0900-117-4-4" to Petrello for $2.1 million.  (*See id.*, ¶ 1.)  The "Tax Map Designation" refers to lots 4, 5 and 6 on the map annexed as Attachment 1 to the Contract of Sale.  (*See id.*, "Schedule A.")  The Court applies that clear language.  *See Mun. Capital*, 181 F. Supp. 2d at 392.

## IV.    Contract-Related Remedies

Each party makes an argument for remedy under the terms of the contract.  Petrello requests specific performance.  White requests the imposition of a constructive trust.

### A.    Specific Performance

Petrello requests specific performance of the contractual terms.  White argues that the Court should deny Petrello's motion because Petrello failed to introduce evidence that they paid the $355,000 downpayment to the escrowee, thereby failing to perform under the contract.

Specific performance can be a proper remedy in actions for breach of contract for the sale of real property. *See Judnick Realty Corp. v. 32 W. 32nd St. Corp.*, 61 N.Y.2d 819 (1984); *Cho v. 401-403 57th St. Realty Corp.*, 752 N.Y.S.2d 55, 57 (2002).  To obtain specific performance, the requesting party must show: (1) the making of the contract and its terms, including a description of the subject matter; (2) that the party is ready, willing, and able to perform the contract and has

fulfilled all of his duties to date; (3) that it is within the opposing party's power to perform; and (4) that there is no adequate remedy at law (an element that need not be pled where the contract is for the sale of real property). *See* 96 N.Y. Jur 2d, "Specific Performance," § 69; *see also La Mirada Prods. Co., Inc. v. Wassall PLC*, 823 F. Supp. 138, 140 (S.D.N.Y. 1993); *Mercantile-Safe Deposit & Trust Co. v. Trans World Airlines, Inc.*, 771 F. Supp. 90 (S.D.N.Y. 1991); *Conn. Nat'l Bank v. Trans World Airlines, Inc.*, 762 F. Supp. 76 (S.D.N.Y. 1991); *Travelers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087 (S.D.N.Y. 1989); *Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.*, 470 F. Supp. 1308, 1324 (N.D.N.Y. 1979).

As to the first element, it is clear that a contract was established between the parties. The third element is clearly proven because White holds title to the realty. There is similarly no dispute as to the fourth element.

The only question pertains to the second element: Has Petrello fulfilled all of his duties to date? White argues that Petrello did not fulfill his duties because he never issued a $355,000 downpayment check payable to the escrowee at the time of the signing of the contract in August of 1998.

Though White claims that Petrello failed to prove payment of the downpayment during the aborted trial before Judge Wexler, the Court need not look there for proof of payment. Instead, the inquiry begins and ends with the contract itself. *Weiss*, 293 F. Supp. 2d at 412 (S.D.N.Y. 2003) ("[I]f the [contract] language is clear, apply that clear language."). In the contract, White acknowledged receipt of the $355,000 downpayment:

> 3. Purchase Price: . . . on the signing of this contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, *the receipt*

> *of which is hereby acknowledged*, to be held in escrow pursuant to paragraph 6 of
> this contract (the "Downpayment"): $355,000.00

(Pls.' Summ. J. Mem., Ex. A-1 ¶ 3 (emphasis added)). White argues that Petrello failed to prove that he actually paid the downpayment to the escrowee (*See* Defs.' Mem. for JMOL at 14 ("'subject to collection' – that is, they must actually be collected by the Escrowee")), but White glosses over the key phrase in the clause: "[T]he receipt of which is hereby acknowledged." White acknowledged receipt of payment, and proffers no argument that the checks did not clear or that he never received the funds.

White raises no other argument to challenge Petrello's request for specific performance. It is uncontroverted that Petrello gave two checks totaling $355,000 to White by January 13, 1998, eight months before the signing of the Contract of Sale. It is further uncontroverted that Petrello paid White another $280,000 on December 30, 1998 at White's request. White does not dispute that he received these $635,000 from Petrello. He merely contends that Petrello failed to perform under the contract because Petrello paid these funds directly to White rather than to the escrowee. White essentially asks this Court to privilege form over substance and deny specific performance. Such a request shall not be granted.

White's contention regarding the second element is meritless: there is no question that Petrello performed his duties under the Contract of Sale. Accordingly, the Court grants Petrello's request for specific performance according to the terms of the 1998 Contract of Sale.

### B. Constructive Trust

Despite granting Petrello's motion for specific performance, White's request for the imposition of a constructive trust over four acres of the land at issue, *i.e.* Counterclaim Four,

deserves consideration.  (*See* Defs.' Opp'n Mem. at 15-17.)  Petrello moves for summary

judgment as to Counterclaim Four on the grounds that a fiduciary relationship is an essential

element of a constructive trust claim.  (*See* Pls.' Reply Mem. at 10.)  White, under the assumption

that he had proven the existence of a fiduciary relationship, asks this Court to deny summary

judgment because he and Petrello allegedly entered into a secret oral trust agreement with respect

to the reconveyance of the North Lot, *i.e.* Lot 4, which consists of four acres, to White at

farmland prices one year after Petrello's purchase.  According to White, both parties agreed that

this promise would not be committed to writing because inclusion of these promises might

jeopardize their zoning and tax benefits.  (*See* Defs.' Opp'n Mem. at 15-17.)[9]

Under New York law, "[i]n general, though as an equitable doctrine its application to

particular circumstances is susceptible of some flexibility, to establish a constructive trust there

must be provided: (1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a

transfer made in reliance on that promise, and (4) unjust enrichment." *Bankers Sec. Life Ins.

Soc'y v. Shakerdge*, 49 N.Y.2d 939, 940 (1980) (citations omitted); *see also Cerabono v. Price*,

775 N.Y.S.2d 585 (2d Dep't 2004).  That being said, "strict adherence to the confidential or

---

[9]White essentially argues that he agreed to transfer ten acres to Petrello with the understanding that Petrello would reconvey four of those acres as part of an oral trust agreement between the parties for White's benefit.  The following excerpt from Dukeminier and Johanson's textbook on wills and trusts captures the realities of the present issue:

> [J]udging by the cases, a surprising number of persons from time to time put title to land in another, relying upon the transferee's oral promise to reconvey.  Some of the transferors are attempting to avoid their creditors or spouses or to achieve some tax benefit.  Of course, any lawyer knows these transferors are asking for trouble and, human nature being what it is, usually they, like King Lear, get it.

JESSE DUKEMINIER & STANLEY M. JOHANSON, WILLS, TRUSTS & ESTATES 609 (6th ed. 2000).

fiduciary relationship element of a constructive trust is not necessary when a party holds property under circumstances that in equity and good conscience he ought not retain." *Sec. Pacific Mortg. & Real Estate Servs., Inc. v. Republic of Philippines*, 962 F.2d 204, 210 (2d Cir. 1992). Instructive on this point is the famous passage from Justice Cardozo's opinion in *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380 (1918). He wrote, "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Id.* at 386. Thus, though the Court has found that no fiduciary relationship existed between Petrello and White, this finding alone will not preclude the imposition of a constructive trust. *See Koreag, Controle Et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag, Controle Et Revision S.A.),* 961 F.2d 341, 354 (2d Cir.1992) (holding that the lack of a fiduciary relationship between the parties does not automatically defeat the claimant's claim for a constructive trust); *see also Simonds v. Simonds*, 45 N.Y.2d 233, 241 (1978); *Latham v. Father Divine*, 299 N.Y. 22, 27 (1949).

Thus, the Court must consider the other factors, which were not briefed by the parties. The Court focuses its inquiry on the fourth factor because unjust enrichment is the backbone of a constructive trust claim. "'It is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion.'" *Farano v. Stephanelli*, 183 N.Y.S.2d 707, 711 (1st Dep't 1959) (quoting *Sinclair v. Purdy*, 235 N.Y. 245, 253 (1923)).

"Ordinarily, one who receives what he is entitled to under a contract may be enriched, but he is not *unjustly* enriched." *In re Stylesite Mktg., Inc.*, 253 B.R. 503, 510 (Bankr. S.D.N.Y.

2000) (citation and quotation marks omitted).  Consistent with that rationale, New York Courts

and the Second Circuit have consistently held "that the existence of a written agreement

precludes a finding of unjust enrichment."  *In re First Cent. Fin. Corp.*,  377 F.3d 209, 214 (2d

Cir. 2004); *see also*, *Rodgard Corp. v. Miner Enter.*, No. 84-CV-0397E(M), 1998 WL 864943, at

*4 (W.D.N.Y. December 8, 1998) ("Where there exists a 'valid and enforceable written contract

governing a particular subject matter,' quasi contractual claims, including claims for unjust

enrichment and constructive trust are not allowed."); *Stylesite*, 253 B.R. at 507-08 (holding that

the existence of a "valid contract" "bars the imposition of a constructive trust" because

"quasi-contractual claims such as unjust enrichment are not permitted if a written contract

between the parties governs the subject matter of their dispute"); *Goldman v. Metro. Life Ins.*

*Co.*, 5 N.Y.3d 561 (2005) ("The theory of unjust enrichment lies as a quasi-contract claim. It is

an obligation the law creates in the absence of any agreement."); *G & G Inv., Inc. v. Revlon*

*Consumer Prod. Corp.*,  724 N.Y.S.2d 411 (1st Dep't 2001) ("Since a valid contract exists

governing the subject matter in dispute, the cause of action for unjust enrichment is untenable.")

The Court has found that there is a valid, enforceable contract in this case, *i.e.* the

Contract of Sale.  Furthermore, that valid agreement explicitly contemplates the fate of the land

at issue.  The Contract of Sale grants to White a first right of refusal in the event that Petrello

decides to sell Lot 4.  (*See* Pls.' Summ. J. Mem., Ex. A-1 ¶ 33(5) ("If Buyer proposes to sell or

otherwise transfer all or any portion of Lot 4 to any third-party . . . Buyer shall . . . offer Seller the

opportunity within a thirty-day period to match the transaction on the same terms and

conditions.").)  Thus, White's claim that there was a secret agreement to reconvey Lot 4 at

farmland prices runs directly counter to the express terms of the written agreement.  Consistent

with New York and Second Circuit law, the existence of that agreement, which explicitly contemplates the disposition of the land at issue, bars a finding of unjust enrichment. Accordingly, as a matter of law, the Court cannot impose a constructive trust and the Court grants Plaintiffs' motion for summary judgment dismissing the Fourth Counterclaim.

## V.    Bad Faith Dealing with Regard to the Settlement Agreement of March 2003

Finally, White seeks leave to file a Second Amended Answer and Supplemental Answer incorporating three new counterclaims based upon Petrello's conduct with respect to the parties' Settlement Agreement. White alleges that Petrello: (1) fraudulently induced him into the settlement agreement (Proposed Counterclaim 6); (2) breached the settlement agreement (Proposed Counterclaim 7); and (3) acted in bad faith regarding the settlement agreement (Proposed Counterclaim 8). (*See* Defs.' Mem. for JMOL at 17.) White does not request enforcement of the settlement agreement. White instead requests compensatory damages for duplicative litigation costs, attorneys' fees, and emotional distress. (*See id.* at 19.)

White claims that leave to amend should be freely granted: he is not seeking to amend in bad faith, he has not been dilatory, and amendment would not prejudice Petrello. (*See id.* at 19.) Petrello seeks to quash White's proposed counterclaims by arguing that such claims are in violation of the settlement agreement because, according to the settlement, these issues should have been brought before the Special Master. (*See* Pls.' Opp'n Mem. at 19-22.)

As an initial matter, the Court finds no merit to Petrello's objection to the amendments based upon the terms of the settlement agreement. Petrello terminated the settlement agreement, so his reliance upon the terms of the settlement agreement is ironic at best. Moreover, even if the

Court were to examine the terms of the settlement agreement, Petrello's claim that the settlement divested this Court of jurisdiction to entertain White's proposed counterclaims is not persuasive.

Petrello initially contends that the Court should preclude White from bringing these new counterclaims because, according to the settlement agreement, the Special Master was to resolve all disputes under said agreement. (*See id.* at 22; *see also* "Settlement Agreement" ¶ 8 ("The Court . . . shall appoint a Special Master to resolve any and all disputes that may arise under the terms of this Settlement Agreement.").)  Petrello provides no case law to support his position, only citing to *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) and *Prima Paint*'s well-known holding that an arbitration clause divests the federal court of jurisdiction to adjudicate a claim of fraud in the inducement of the contract.  For a number of reasons–none less than the fact that *Prima Paint* involved an arbitration clause and an explicit federal policy regarding arbitration clauses, whereas this dispute involves a settlement agreement–*Prima Paint* is distinguishable from the present dispute.  There were other arguments available to Petrello (such as those posed in *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383-85 (1993)), but Petrello failed to raise them.  Accordingly, Petrello's argument that the settlement agreement in any way divested this court of jurisdiction is unsupported.

White moves for leave to amend pursuant to Rule 15(a), which provides in pertinent part that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  A motion to amend should be denied, however, "if there is an 'apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.'"  *Dluhos v. Floating & Abandoned*

*Vessel, Known as N.Y.*, 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Although the decision of whether to allow a party to amend his complaint is left to the sound discretion of the district court, there must be good reason to deny the motion. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979). As to each of the three proposed counterclaims, White has shown good cause because the events creating these causes of action did not occur until 2003. (*See* Defs.' Mem. for JMOL at 17.)

A.  **Fraud in the Inducement**

White's proposed Sixth Counterclaim alleges fraud in the inducement with respect to the Settlement Agreement. (*See* 2d Am. Answer ¶ 248.) Petrello argues that the Sixth Counterclaim should be dismissed because White failed to plead the proposed fraud claim with particularity.

When the complaint contains allegations of fraud, Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity." The complaint must: (1) specify the statements that White contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *Acito*, 47 F.3d at 51 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

White's proposed counterclaim for fraud in the inducement fails to specify any statement that White contends were fraudulent. White argues that "[t]he fraudulent statements are clearly alleged in the proposed pleading (the Petrellos told [White] and the Court that they were settling to *resolve* the litigation, not for the purpose of getting a new judge and jury to *continue* the litigation)." (*See* Defs.' Reply Mem. at 9.) White then cites to eight paragraphs in its Second

Amended Answer, arguing that those paragraphs clearly allege the specific fraudulent statements. (*See id.* (citing 2d Am. Answer ¶¶ 184, 185, 187, 248-52).)

Reviewing those eight paragraphs, however, the Court is unable to find any alleged "statement" by Plaintiffs. Paragraphs 184 and 185 merely recite the circumstances and terms of the settlement agreement. Paragraph 187 accuses Petrello of a fraudulent state of mind, but does not reference any "statement." (*See* 2d Am. Answer ¶ 187 ("[Petrellos] decided upon a course of action designed to delay and manipulate the application process so that they could terminate the Settlement Agreement.").) Finally, paragraphs 248 through 252 refer to a "representation" by Petrello that he intended to honor the terms of the Settlement Agreement, but those paragraphs provide no citation to any specific statement. Clearly, then, White has failed to specify the statements that he contends were fraudulent. *See Acito*, 47 F.3d at 51. White alleges a fraudulent scheme without any specific evidence; it is merely an allegation of Petrello's state of mind without specific support. Lacking any particularity, the claim is futile and leave to amend to add the Sixth Counterclaim is denied. *See id.* at 55.

### B. Breach of Settlement Agreement and Bad Faith

White's proposed Seventh Counterclaim alleges that Petrello breached the Settlement Agreement by failing and refusing to deliver acceptable subdivision application documentation to White in a prompt and timely fashion. (*See* 2d Am. Answer ¶ 256.) White alleges that this breach caused injury because it forced White to expend additional sums on litigation, forced White to expend additional sums on attorneys' fees and costs, and caused White to experience and suffer severe emotional distress. (*See id.* ¶ 257.) White seeks compensatory and punitive damages. (*See id.* ¶ (g).)

White's proposed Eighth Counterclaim alleges that Petrello breached the covenant of good faith and fair dealing with respect to the Settlement Agreement by intentionally delaying his performance and by deliberately sabotaging the Settlement Agreement. (*See id.* ¶ 260.) White alleges that Petrello's bad faith caused injury because it forced White to expend additional sums on litigation, forced White to expend additional sums on attorneys' fees and costs, and caused White to experience and suffer severe emotional distress. (*See id.* ¶ 262.) White seeks compensatory and punitive damages. (*See id.* ¶ (h).)

"Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights." *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 613 (1994). Thus, as to both claims, the request for punitive damages is clearly without factual or legal support and entirely futile.

Petrello does not specifically contest the merits of the proposed Seventh and Eighth Counterclaims beyond the assertion that any amendment at this juncture would be prejudicial. (*See* Pls.' Opp'n Mem. at 23.) Legitimate grounds to deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Stiller v. Colangelo*, 221 F.R.D. 316, 317 (D. Conn. 2004).

Again, White does not seek specific performance of the settlement agreement. White merely requests compensatory damages for the duplicative litigation costs, attorneys' fees, and emotional distress caused by Petrello's alleged breach of the settlement agreement and bad faith.

Petrello argues that amendment at this juncture would cause him great prejudice because his family will be prevented from closing the land purchase. (*See* Pls.' Opp'n Mem. at 23-24.)

As the Court held above, summary judgment granting Petrello's request for specific performance of the Contract of Sale is appropriate. Because White does not seek specific performance of the settlement agreement, White's seventh and eighth claims would not disturb that holding. White's Seventh and Eighth Amendments, then, would not prejudice Petrello in that regard. Furthermore, Petrello did not substantively challenge the Seventh and Eighth claims, and the Court is not prepared to dismiss those claims as entirely futile.

Accordingly, as to the Seventh and Eighth Counterclaims, except the requests for punitive damages, the Court grants White's motion for leave to amend.

*CONCLUSION*

Plaintiffs' motion for summary judgment is GRANTED and the Court ORDERS specific performance of the August 1998 Contract of Sale. Defendants' counterclaims one through five are DISMISSED, and their request to amend as to the proposed sixth counterclaim is DENIED. Defendants' request to amend as to counterclaims seven and eight is GRANTED.

    **SO ORDERED.**

Dated: Central Islip, New York
        February 2, 2006                                      /s/
                                                  Denis R. Hurley
                                                  United States District Judge