**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
ANTHONY G. PETRELLO and CYNTHIA A.
PETRELLO,

                     Plaintiffs,

            - against -

JOHN C. WHITE, JR., and WHITE INVESTMENT
REALTY, LP,

                   Defendants.
-----------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

CV 01-3082 (DRH) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    PRELIMINARY STATEMENT

     Presently before the Court is Plaintiffs' motion for leave to amend the Supplemental and

Amended Complaint ("Amended Complaint") and to file a proposed Second Supplemental and

Amended Complaint ("Second Amended Complaint") pursuant to Fed. R. Civ. P. 15(a) and (d).

*See* DE 375. The Second Amended Complaint sets forth additional factual allegations and claims

against previously named as well as newly added Defendants.  *See* DE 375, Ex. A.  Defendants

oppose the motion primarily on the grounds of futility.  *See* DE 376.  This motion has been

referred to me by Judge Hurley for a Report and Recommendation.  *See* Electronic Order of Oct.

4, 2010.  Based upon my review of the arguments advanced by both parties during oral argument

and in their written submissions, as well as the applicable case law, I respectfully recommend to

Judge Hurley that the Plaintiffs' motion to amend be GRANTED in part and DENIED in part.

## II. FACTUAL BACKGROUND

### A. Amended Complaint[1]

Plaintiffs Anthony Petrello and Cynthia Petrello reside in Houston, Texas. Am. Compl. ¶ 1. Defendant John C. White, Jr. ("White"), was the owner of approximately 57 acres of real property located in Sagaponack, New York, which is part of the Town of Southampton. *Id.* ¶ 8. This property is identified on the Subdivision Map of John C. White Farm, filed in the office of the Suffolk County Clerk on June 21, 2000. *Id.* Apparently, Defendant White is also a partner of Defendant White Investment Realty, LP (hereinafter "White Investment Limited Partnership" or "WILP").[2] *Id.* ¶ 10

On August 25, 1995, White and Plaintiffs executed a document entitled "Memorandum of Sale" which provided for the sale to Plaintiffs, for a purchase price of $2 million, certain real property constituting a portion of the 57 acres. *Id.* ¶ 11. The terms of this agreement provided that White would retain counsel to represent him in the transaction and that the parties would enter into a more complete and detailed agreement. *Id.* In addition to a more complete and detailed agreement being executed, the sale could not be closed until the Planning Board of the Town of Southampton granted approval of the sale and an approved subdivision plat was filed with the Suffolk County Clerk. *Id.* ¶ 12.

---

[1] The original Complaint was filed on May 15, 2001. *See* DE 1. However, after learning about the transfer of Lot 1, which is described *supra*, Plaintiffs filed a Supplemental and Amended Complaint adding Defendant White Investment Realty. DE 19. This Supplemental and Amended Complaint was accepted by Magistrate Judge Orenstein on January 3, 2002. DE 26.

[2] In Judge Hurley's Order dated February 2, 2006, the Court noted that White Investment Realty, LP was erroneously named in the Complaint. DE 220.

Sometime in early 1998, White retained P. Edward Reale, Esq. Along with other lawyers in the firm of Twomey, Latham, Shea & Kelley, LLP and negotiated with Plaintiffs the terms and conditions of the transaction, including payment of the purchase price, rights of first refusal and location of the proposed driveway "right of way." *Id.* ¶¶ 13-14. This same year, Plaintiffs and White executed a written contract of sale ("Contract"). In the Contract, White agreed to sell the lots designated as Lots 4, 5 and 6 on the proposed Final Plat of White's Subdivision (which was prepared on February 4, 1998) for $2.1 million, plus the payment of all White's subdivision costs, fees and expenses. *Id.* ¶¶ 15-16. Plaintiffs paid White $355,000 as a down payment on the purchase price under the Contract. *Id.* ¶ 18. On December 30, 1998, Plaintiffs paid an additional $280,000 to White. *Id.* ¶ 19. Plaintiffs also paid all of White's requested expenses of at least $191,720 in connection with the transaction itself as well as the approval and filing of the subdivision map. *Id.* ¶ 20.

Pursuant to Paragraph 33 of the Rider to the Contract ("Rider"), if White proposed to sell or otherwise transfer all or any portion of the remaining property other than to a "related party," then, prior to entering into such a transaction, White had to afford Plaintiffs an opportunity within a 30-day period to match the transaction under the same terms and conditions. *Id.* ¶ 21. Transfers to a "related party" were permitted so long as the transferee agreed to be bound by the same right of first refusal. *Id.* Apparently, by deed dated November 28, 2000, White transferred Lot 1 to Defendant WILP without providing Plaintiffs the opportunity to match the transaction. *Id.* ¶¶ 9, 22.

In the Amended Complaint, Plaintiffs sought specific performance of the Contract, which included all agreements contained therein. *Id.* ¶ 29. Regarding damages, should specific

performance not be granted, Plaintiffs sought damages associated with White's breach of his agreement with the Plaintiffs. *Id.* ¶¶ 41-42. Plaintiffs also claimed that in reasonable anticipation of the Contract, they retained an architect and other professionals and consultants who collectively commenced the process of designing and obtaining building plans and approvals for the construction of residential improvements to the property resulting in costs of $335,071.63. *Id.* ¶¶ 31-32. Plaintiffs also sought delay damages associated with White's refusal to close title since Plaintiffs' principal purpose in seeking to purchase Lots 4,5 and 6 was to construct a residence and associated residential structures. *Id.* ¶¶ 35-37. Finally, Plaintiffs sought restitution damages for the sums advanced to White for the purchase price as well as the fees and expenses associated with purchasing the property. *Id.* ¶¶ 39, 44-46.

**B.     Proposed Second Amended Complaint**

In the Second Amended Complaint, Plaintiffs correct the caption to properly name the defendant White Investment Realty, LP, and name the following additional Defendants: (1) The John N. White 2008 Exempt Trust ("John Trust"); (2) The Jeffery G. White 2008 Exempt Trust ("Jeffery Trust"); (3) The Barbara J. White 2008 Exempt Trust ("Barbara Trust"); (4) The Thomas D. White 2008 Exempt Trust ("Thomas Trust"); (5) Jeffery G. White as Trustee of the Jeffery Trust and the John Trust; (6) Thomas D. White as trustee of the Thomas Trust and John Trust; and (7) Barbara J. White as Trustee of the Barbara Trust. *See* DE 375, Ex. A ("Sec. Am. Compl.").

Plaintiffs further amplify their specific performance claim pursuant to the alleged right of first refusal for Lot 1 and add additional specific performance claims pursuant to their right of first refusal as to Lots 2, 3, 7 and the Agricultural Reserve, all of which are identified on the

White Subdivision Map.[3]  Regarding Lot 1, Plaintiffs assert that on November 28, 2000, White transferred title of Lot 1 to WILP for zero consideration.  Plaintiffs claim that only 46.99% of the equity of WILP was owned by the "White Family Trust" which violated the Rider to the Contract regarding Plaintiffs' right of first refusal.

Further, Plaintiffs now allege that on July 30, 2008 White made the following transfers: (1) 25% interest in Lot 2 for $921,250 to the Thomas Trust; (2) 95% interest in Lot 7 for $3,145,925 to the John Trust, Barbara Trust, Jeffery Trust, and Thomas Trust as tenants in common, each having an undivided 23.75% interests; and (3) 95% interest in the Agricultural Reserve for $1,204,125 to the John Trust, Barbara Trust, Jeffery Trust and Thomas Trust as tenants in common, each having an undivided 23.75% interest.   Plaintiffs allege that these transfers also violated their right of first refusal.

Because Plaintiffs allege that Defendants never presented them with a copy of the transaction and the chance to match the consideration paid for the Lots, Plaintiffs now assert that they are entitled to specific performance.  That remedy includes rescinding the current transfers and presenting the same offers to Plaintiffs for the same consideration plus additional damages of lost rental value and attorneys' fees associated with enforcing their rights of first refusal.  In the event specific performance is not granted, Plaintiffs seek damages equal to the market value of the transferred Lots, less the price Plaintiffs would have paid to acquire them.

---

[3]     Although the Agricultural Reserve is not numbered as a separate "lot" on the White Subdivision Map, Plaintiffs assert that it falls within the definition of the "entire map of White's subdivision" found in Paragraph 33(12) of the Rider.

Plaintiffs also seek further "delay damages" not contained in the previous Amended Complaint, separate and apart from the specific performance already granted in their favor.[4] Plaintiffs set forth additional factual allegations regarding the Contract, Defendant's refusal to close, and the eventual closing which occurred on July 8, 2010. Plaintiffs maintain that they should be placed in the same position they would have been if White had signed the closing documents as he should have on November 14, 2000. Plaintiffs argue that they would have immediately begun the process of (1) constructing a home of at least 18,000 square feet on Lot 5 and (2) renovating and enlarging the existing cottage on Lot 6.

## III. STANDARD OF REVIEW

Plaintiffs argue that the new proposed claims for various breaches of their right of first refusal in 2008 constitute a "supplement" under Fed. R. Civ. P. 15(d) because they involve transactions and events that happened after the date of the original pleading. *See* Nica B. Strunk Aff. in Supp. of Mot. to Am. and Supp. Compl. ("Strunk Aff.") ¶ 16. Rule 15(d) states:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.

Fed. R. Civ. P. 15(d). According to Plaintiffs, leave to file a supplemental pleading is freely permitted when the supplemental facts connect to the original pleading. *See* Strunk Aff. ¶ 18. Plaintiffs maintain that leave to supplement is warranted here since the alleged subsequent transactions, events, parties and claims arose directly out of the original pleading, which included claims for specific performance pursuant to Plaintiffs' right of first refusal. *Id.* ¶ 19. Plaintiffs

---

[4]     Judge Hurley ruled on February 2, 2006 that the Contract of Sale was valid and enforceable. *See* DE 220.

also seek to "amend and supplement" their claim of delay damages pursuant to Rule 15(d) and/or Rule 15(a)(2). *Id.* ¶¶ 21, 25

As an initial matter, the Court does not agree with Plaintiffs' characterization that the subsequent transactions, events, parties and claims to be added arose directly out of the original pleading. Specifically, the subsequent transfers of Defendant White's remaining Lots to the various Trusts in 2008 (1) did not arise out of the Contract for sale between Plaintiffs and White; (2) included different parties; and (3) were unrelated to the Transfer of Lot 1 to WILP in 2000. Not only do Plaintiffs seek to plead additional transactions and events, they also allege six new causes of action.

Further, and to the extent Plaintiffs are advocating for a separate standard regarding supplementing a pleading as opposed to amending a pleading, such an argument is unsupported by Rule 15 and the relevant case law. In fact, the very case cited by Plaintiffs that purportedly buttresses their argument for the application of a distinct standard under Rule 15(d) actually utilizes the same standard applied by courts in deciding whether to grant leave to amend under Rule 15(a). *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) ("15(d) permits a party to move to serve a supplemental pleading and the district court may grant such a motion, in the exercise of its discretion, upon reasonable notice and upon such terms as may be just. Absent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility, the motion should be freely granted.").

Under Rule 15(a), leave to amend "shall be freely given when justice so requires" and such leave is within the court's discretion. *See* Fed. R. Civ. P. 15(a); *Grace v. Rosenstock*, 228 F.3d 40, 56 (2d Cir. 2000). Notwithstanding the foregoing principle, leave to amend may be

denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Rachman Bag Co. v. Liberty Mutual Ins. Co.*, 46 F.3d 230, 234 (2d Cir. 1995) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also SCS Commc'n, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 345 (2d Cir. 2004) (under Rule 15(a), "leave to amend a pleading may *only* be given when factors such as undue delay or undue prejudice to the opposing party are absent.") (emphasis in original). "The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial." *Fariello v. Campbell*, 860 F. Supp. 54, 70 (E.D.N.Y. 1994); *see also European Cmty. v. RJR Nabisco, Inc.*, 150 F. Supp. 2d 456, 502-03 (E.D.N.Y. 2001); *Saxholm AS v. Dynal, Inc.*, 938 F. Supp. 120, 123 (E.D.N.Y. 1996). The opposing party likewise bears the burden of establishing that an amendment would be futile. *See Blaskiewicz v. County of Suffolk*, 29 F. Supp. 2d 134, 137-38 (E.D.N.Y. 1998) (citing *Harrison v. NBD Inc.*, 990 F. Supp. 179, 185 (E.D.N.Y. 1998)).

IV. **DISCUSSION**

   A. **Jurisdiction**

At the outset, Plaintiffs argue that the case is not stayed due to Plaintiffs' filing of a Notice of Appeal on July 8, 2010 (*see* DE 368) seeking relief from a portion of Judge Hurley's Order dated June 9, 2010 (*see* DE 355). Strunk Aff. ¶ 5. Plaintiffs argue that the June 9 Order – which determined that the contractual provision "Lots 5 and 6 shall be subject to a covenant that they shall be owned by a common owner of record" requires that title to Lots 5 and 6 shall be in the same person or persons – is an injunctive Order. Therefore, Plaintiffs claim that the District

Court has full jurisdiction to consider this motion since their appeal was based on 28 U.S.C. § 1292(a)(1), which permits an interlocutory appeal from an injunctive order. *Id.* ¶¶ 6-10. Defendants take no position on this issue but do not object to the Court ruling on the motion to amend. *See* Defs.' Mem. of Law in Opp. to Pls.' Mot. to Am. ("Defs.' Mem.") at 2.

The Second Circuit has established that an interlocutory appeal from an order which grants or denies a preliminary injunction is an exception to the general rule that an appeal may only be taken from a final judgment and that a notice of appeal divests the District Court of jurisdiction. *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1350 (2d Cir. 1989). However, the instant case did not specifically involve an appeal from a preliminary injunction. Further, on the jurisdiction issue, the Second Circuit has held that "[a]nother exception to total divestiture of district court jurisdiction occurs when the judgment appealed from does not determine the entire action, in which case the district court may proceed with those matters not involved in the appeal." *Id.; see also Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance–it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). In this case, the Plaintiffs' appeal involved only one narrow aspect of the case as a whole, which was not completely resolved even after specific performance of the sale of Lots 4, 5, and 6 to Plaintiffs pursuant to a Partial Final Judgment entered on January 6, 2009. *See* DE 276. Therefore, jurisdiction to decide this motion was not divested upon Plaintiffs' filing of their appeal.

### B.   Specific Performance Claims

Defendants argue that Plaintiffs' proposed pleading, which adds six new claims seeking specific performance and damages arising from alleged breaches of a granted right of first refusal in Lots 2, 7 and the Agricultural Reserve, has no merit. Thus, Defendants argue that any amendment regarding these claims would be futile. *See* Defs.' Mem. at 3-5. Plaintiffs contend that the proposed new pleading does not change the nature of Plaintiffs' claims since they always sought specific performance of the right of first refusal. Therefore, Plaintiffs argue that any futility argument "rings hollow." *See* Reply Mem. in Supp. of Mot. to Am. ("Pls.' Reply") at 1. In addition, Plaintiffs claim that Defendants' futility argument manipulates case law in an attempt to elevate the standard for amendment/supplementation of a pleading, which is that it should be freely granted. *Id.* at 1-2.

Although Plaintiffs correctly point out that they previously pled specific performance regarding their right of first refusal as to Lot 1, the circumstances surrounding their claims for specific performance with regard to Lots 2, 7 and the Agricultural Reserve are entirely different. Furthermore, and as already discussed, futility is a valid basis to deny a motion to amend or supplement a pleading. *See, e.g., Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 19 (2d Cir. 1995) (finding that futility "is an adequate ground for denial of a motion to amend"); *In re Horizon Cruises Litig.*, Nos. 94 Civ. 5270, 94 Civ. 6147, 95 Civ. 374, 96 Civ. 3135, 1999 WL 436560, at *1 (S.D.N.Y. June 24, 1999) ("If amending the complaint would be futile because, for example, the amendment would not survive a motion to dismiss, then leave to amend should be denied.").

A proposed amendment is futile when it fails to state a claim upon which relief may be

granted. *See Dougherty v. Town of N. Hempstead Bd of Zoning appeals*, 282 F.3d 83, 88 (2d Cir. 2002); *Health-Chem Corp. v.* Baker, 915 F.2d 805, 810 (2d Cir. 1990). A determination of futility is governed by the same standards as a motion to dismiss under Rule 12(b)(6). *See Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Under Rule 12(b)(6), the court must accept as true the factual allegations set forth in the complaint and draw all reasonable inferences in favor of plaintiff. *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans*, 421 F.3d 96, 100 (2d Cir. 2005). Moreover, the review is limited to facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference. *See Nechis*, 421 F.3d at 100. A complaint should not be dismissed unless it does not set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544. 570 (2007) (to withstand a motion to amend, a complaint must "raise a right to relief above the speculative level"). "A complaint is inadequately pled 'if it tenders naked assertion[s]' devoid of 'further factual enhancement.'" *Brookfield Asset Management, Inc. v. AIG Financial Products Corp.*, No. 09 Civ. 8285, 2010 WL 3910590, at *4 (S.D.N.Y. Sept. 29, 2010) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

　　　　Paragraph 33(4) of the Rider granted Plaintiffs a right of first refusal over the remaining "Farm Property." *See* Decl. of Monica S. Asher in Opp. to Pls.' Mot. To Am. ("Asher Decl."), Ex. A ¶ 33(4). The agreement stated:

> If Seller proposes to sell or otherwise transfer all or any portion of the Farm Property (the remaining property on the attached Map of White's Subdivision) to any third-party, then, prior to entering into such a transaction (or each such transaction in the event of periodic sales), Seller shall provide to Buyer a written copy of the proposed

transaction and offer Buyer the opportunity within a thirty-day period
to match the transaction on the same terms and conditions.

*Id.* The agreement continued that the right of first refusal would not apply to any sale or transfer

to a "related party." Paragraph 33(6) of the Rider defined "third-party" and "related party" as

follows:

> a third-party shall be any person or entity other than a 'related party'.
> A 'related party' shall in the case of Seller refer to any of the
> following: (i) any person or group of persons who are descendants of
> John C. White, Jr. and Elizabeth J. White; (ii) any trust, at least ninety
> (90) percent of the value of which provides for beneficiaries who are
> the person listed in (i); (iii) any general or limited partnership at least
> (90) percent of the equity of which is owned by partners who are the
> persons listed in (i); and (iv) any corporation or other limited liability
> entity at least ninety (90) percent of the shares are owned by
> shareholder or owners who are listed in (i).

*Id.* ¶ 33(6). The underlying basis for Plaintiffs' proposed new claims is that Defendant White's

transfers of Lot 2,7 and the Agricultural Reserve to the various Trusts in 2008 (*i.e.* the John

Trust, Jeffery Trust, Barbara Trust and Thomas Trust) triggered Plaintiffs' right of first refusal

because those Trusts were not "related parties" pursuant to Paragraph 33(6) of the Rider. *See*

Strunk Aff. ¶ 15; Pls.' Reply at 2-3. Defendants argue, and Plaintiffs do not contest, that for each

of the Trusts, the current beneficiaries are descendants of John C. White and Elizabeth J. White.

*See* Defs.' Mem. at 4. However, the factor which Plaintiffs claim triggered their right of first

refusal was that each Trust contained a very broad power of appointment at the time the transfer

occurred. Thus, Plaintiffs contend that the Trust did not meet the definition of "related party" at

the time of the transfer because the possibility existed that 90% of the Trust would not be owned

by White descendants. *See* Pls.' Reply at 3-6. The Thomas Trust, Barbara Trust, John Trust and

Jeffery Trust gave each beneficiary a Limited Power of Appointment by Will. Paragraph 3.01(b) of their respective Trusts states:[5]

> On the death of [beneficiary], the trustee shall distribute so much or all of the remaining trust property to or for the benefit of such one or more persons or organizations as [beneficiary] appoints by will; except that [beneficiary] may not appoint to or for the benefit of [beneficiary], his estate or the creditors of either.

Asher Decl., Ex. B, ¶ 3.01(b). Plaintiffs maintain that this power of appointment enabled the beneficiary descendant of the Whites, upon the beneficiary's death, to potentially appoint a non-descendant as a beneficiary to the Trust.

A power of appointment "is an authority created or reserved by a person having property subject to his disposition, enabling the donee to designate, within such limits as may be prescribed by the donor, the appointees of the property." *See* EPTL § 10-3.1(a). The power of appointment at issue here is considered testamentary as "it is exercisable only by a written will of the donee." *Id.* § 10-3.3(c). Further, the power is a limited power as opposed to a general power as the donee cannot exercise the power "wholly in favor of the donee, his estate, his creditors or the creditors of his estate." *Id.* § 10-3.2. In this case, the Trust beneficiaries (who are all White descendants) are the donees of the limited powers of appointment. However, a power of appointment does not create an interest, and thus make a beneficiary, as to each and every person who is not excluded by the terms of the power of appointment.

"Beneficiaries of a trust are the persons or classes of persons, or the successors in interest or persons or class members, upon whom the settlor manifested an intention to confer beneficial

---

[5]     Although Defendants only submitted a copy of the Thomas D. White 2008 Family Trust to the Court, Defendants advised that each of the Trusts were substantially similar. Plaintiffs do not contest this assertion.

interests (vested or contingent) under the trust, plus persons who hold powers of appointment (special or general) or have reversionary interests by operation of law. *Also included are persons who have succeeded to interests of beneficiaries by assignment,* inheritance, or otherwise." REST 3d TRUSTS § 48 (2003) (emphasis added). As the Restatement clearly sets forth, only those persons who "have succeeded to interests of beneficiaries by assignment" are considered to have a beneficial interest. If, and only if, the holders of the powers of appointment designate a non-descendant appointee do Plaintiffs here have a claim that their right of first refusal was triggered. The fact that Defendants did not further limit the power of appointment to only descendants of John and Elizabeth White does not alone trigger Plaintiffs' right of first refusal.[6] Plaintiffs' reference to EPTL § 7-1.1 does not persuade the Court otherwise. First, Section 7-1.1 states that trust interests are not considered "merged" or invalid solely because the creator of a trust is or may become the sole trustee and sole holder of the present beneficial interest as well. These are clearly not the current circumstances in this case. Moreover, the mere fact this section states that beneficial interests can be "vested or contingent, present or future" does not support Plaintiffs' position that unidentified potential appointees hold future interests and are therefore beneficiaries to a trust. Indeed, Plaintiffs have not cited any case or statute which stands for such a proposition. Plaintiffs also cite EPTL § 10-3.3 which states that a

---

[6] The cases cited by Defendants add little support to their argument. In *In re Manville's Will,* 117 N.Y.S.2d 220 (N.Y. Surr. Ct. 1952), the court held that "[p]owers of appointment fall within the general definition of powers which are described not as an estate or interest but an authority to create an interest." However, in this case the Plaintiffs are arguing that the future appointees have beneficial interests in the trust, not the present donees of the powers of appointment. In addition, *In re Hart's Estate,* 177 Misc. 183, 30 N.Y.S.2d 147 (N.Y. Surr. Ct. 1941) merely stands for the proposition that "[n]o title or interest in the [property] vests in the donee of the power until he exercises the power." Again, however, this case dealt with an interest vesting in the donee of a power, not a future appointee.

testamentary power of appointment is "presently exercisable." However, as discussed above, the power of appointment here is *not* presently exercisable. Only when the holder of the power of appointment dies and his or her will appoints the subsequent beneficiary is an interest created. Not until the death of the current beneficiaries, and a non-descendant is subsequently appointed as beneficiary, can Plaintiffs argue that their right of first refusal was triggered and violated. Accordingly, I respectfully recommend to Judge Hurley that leave to amend to add six claims seeking specific performance and damages arising from alleged breaches of a granted right of first refusal in Lots 2, 7 and the Agricultural Reserve be denied.

### C. Additional Damages

Plaintiffs also seek to "amend and supplement their claim of delay damages to reflect new events and transactions which have occurred since Plaintiffs' last pleading in January, 2002." *See* Strunk Aff. ¶ 21. Plaintiffs argue that because the closing has occurred, the period of delay has now been fixed, beginning in November 2000 when White refused to sign the closing documents and ending when title closed on July 8, 2010. *Id.* ¶ 22. Further, the proposed pleading "amplifies the categories of delay damages sought" based on events which have taken place since the last pleading, such as the incorporation of the Village of Sagaponack and other zoning and regulatory changes. *Id.* ¶ 23. The delay damages now asserted include: (1) lost rental value of the existing and contemplated residences on Lots 5 and 6; (2) increased costs of construction due to increases in the cost of labor, materials, insurance, new regulations applicable to construction in floodzones; and new requirements in the New York State Uniform Fire Prevention and Building Code regarding energy conservation, wind resistance and loading standards; (3) diminution in the value and utility of Lots 4, 5, and 6 caused by changes in the

15

regulation of residential development which have been enacted since November 2000; (4) wasted architectural fees and landscaping expenses incurred in anticipation of closing;[7] and (5) attorneys' fees required to enforce Plaintiffs' right to close title to Lots 4, 5, and 6 under the Contract. *See* Sec. Am. Compl. ¶¶ 41-45.

Plaintiffs claim that Defendant White "has been on notice since the commencement of this case that Plaintiffs would hold him responsible for the delay damages caused by his unjustified refusal to close." *See* Strunk Aff. ¶ 26. Be that as it may, the newly pleaded delay damages sought by Plaintiffs are not viable if they are determined to be futile. In this regard, Defendants argue that Plaintiffs are not entitled to the damages sought in the proposed pleading pursuant to the Contract and as a matter of New York law. Defendants further allege that the damages are entirely speculative, uncertain and immeasurable. *See* Defs.' Mem. at 6-10.

As an initial matter, damages are available in New York when a party seeks specific performance regarding the purchase of real property. *See Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 196 A.D.2d 564, 567, 601 N.Y.S.2d 334 (2d Dep't 1993) ("It is well established that a purchaser of real property who is awarded specific performance, may also recover damages sustained by him or her as a result of the seller's unreasonable and unwarranted delay in conveying the property."). However, "with specific performance granted, the contract is being performed, and the purchaser has not lost the value of the bargain." *Freidus v. Eisenberg*, 123 A.D.2d. 174, 177, 510 N.Y.S.2d 139 (2d Dep't 1986). Therefore, a "court will award to the purchaser, in addition to specific performance of the contract, such items of damage as naturally

---

[7]     The Court notes that the "wasted architectural fees" were previously included in Plaintiffs' Amended Complaint as their second claim for relief. As this claim was previously pled, the Court will not address its merits.

flow from the breach, are within the contemplation of the parties, and can be proven to a reasonable degree of certainty." *Id.* Accordingly, when damages alleged are too speculative and immeasurable, they are not permitted.

### I. *Lost Rental Value*

Plaintiffs' new pleading alleges damages pursuant to "lost rental value of the existing and contemplated residences on Lots 5 and 6, in an amount to be proved at trial." Sec. Am. Compl. ¶ 41. Defendants do not specifically address this claim for damages other than arguing that all delay damages sought by the new pleading are too speculative, uncertain, and immeasurable to be recovered. Defs.' Mem. at 8-10. However, the scant case law in New York on this issue allows a party, in addition to specific performance, to allege damages for the lost rental value with respect to the residences currently existing on such lots. *See Barnum v. Frickey*, 115 A.D.2d 977, 978, 497 N.Y.S.2d 543, 544 (4th Dep't 1985) (awarding fair rental value of property in addition to specific performance). Nevertheless, a plaintiff is not entitled to the lost rental value for any *contemplated* residences. *See Freidus*, 123 A.D.2d. at 177 (*"The measure of the value of the use and occupancy is the rental value of the property, and not any profits which might be derived from its development."). Accordingly, I respectfully recommend to Judge Hurley that Plaintiffs be permitted to amend their complaint to allege damages for the lost rental value of Lots 5 and 6 only with respect to the existing residences on such lots at the time closing occurred.

## 2. Construction Costs

According to Paragraph 42 of Plaintiffs' proposed pleading, Plaintiffs have

> suffered delay damages in the form of increased costs of construction, due, among other things, to increases in the cost of labor, materials and insurance, new regulations applicable to construction in the flood-zones in which Lots 5 and 6 are now located, and new requirements in the New York State Uniform Fire Prevention and Building Code.

Sec. Am. Compl. ¶ 42. Defendants argue that increased construction costs, as a matter of law, are not recoverable damages where specific performance has been ordered and Plaintiffs received everything contemplated by the Contract. Plaintiffs disagree that increased construction costs are not allowed as a matter of law. *See* Defs. Mem. at 6-8.

New York courts have denied the recovery of damages associated with increased construction costs where a delay in performance of a contract for the transfer of land occurred and the contract itself is silent on the issue. *See Cross Properties, Inc. v. Brook Realty Co.*, 76 A.D.2d 445, 452-55, 430 N.Y.S.2d 820, 824-26 (2d Dep't 1980) (denying damages claim for increased construction costs where closing of title was delayed 22 months despite the fact that although the "redevelopment was a topic seriously considered and discussed at length by the parties," the contract, "detailed and negotiated at length, [did] not contain a scintilla of language within its four corners indicating that [defendant] was obligated thereunder to redevelop"); *Regan v. Lanze*, 47 A.D.2d 378, 383, 366 N.Y.S.2d 512, 516 (4th Dep't 1975) *rev'd on other grounds*, 40 N.Y.2d 475, 387 N.Y.S.2d 79 (1976) (In an action for specific performance of a contract to convey real property, the court held that the "item of increased costs of improvements

18

does not have that right of clear predictability of consequence for which an unsuccessful good faith litigant should ordinarily be held responsible.").

Further lending support to the denial of such damages is case law discussing when a contract not only is silent on the issue of increased construction costs, but also contains a merger clause. *See Cross Properties*, 76 A.D.2d at 453 ("To the extent that such an agreement [to redevelop] might have been entered into orally by representatives of the parties to the contract of sale, such understanding would be rendered nugatory by the merger clause."); *see also* 91 N.Y. Jur. 2d, Real Property Sales and Exchanges § 231 (2010) ("A purchaser's damages for delay stemming from the vendor's breach of a contract to sell real property do not include the purchaser's increased cost of construction to improve the site or to redevelop it, where the contract contains a merger clause and requires all agreements between the parties to be in writing, but is silent with respect to redevelopment, even though there is evidence that both parties saw the need for it.").

Although Defendants' conclusion that increased construction costs are never recoverable damages stretches the holdings of the cases cited, the facts of this case support the conclusion that such damages are not recoverable here. The Contract is silent as to any structure or construction on the transferred Lots. The fact that the parties had discussions regarding such a structure being built and blueprints were actually given to Defendants does not open the door to such increased construction costs. *See Cross Properties,* 76 A.D.2d at 450-451 (denying damages despite the parties discussing the need for redevelopment and the fact that plans for redevelopment were exchanged). Additionally, the Contract contained a merger clause which stated that "[a]ll prior understandings, agreements, representations and warranties, oral or

19

written, between Seller and Purchaser are merged in this contract." *See* Asher Decl., Ex. A ¶ 28(a).

Plaintiffs have failed to cite, and the Court has been unable to locate, a single case that has awarded increased construction costs as damages. Instead, Plaintiffs cite *Freidus,* a case which denied the award of increased construction costs. Plaintiffs argue that the recovery of increased construction costs were denied in *Freidus* because the evidence proffered by the plaintiff was too conclusory and speculative. *See* Pls.' Reply at 7-8. Although such a holding in *Freidus*, and *Cross Properties* and *Regan* for that matter, may open the possibility for a plaintiff to successfully recover such damages, the Plaintiffs here have failed to establish that increased construction costs in these circumstances are not too speculative and immeasurable. Indeed, Plaintiffs are asking the Court to allow them to seek damages for the increased construction costs of a structure which did not exist and to which the parties to the Contract never agreed to build. Since the Contract was silent regarding any development and in light of the fact that a merger clause was included, I recommend to Judge Hurley that such construction cost damages are not recoverable here, and thus, any amendment adding such a damages claim would be futile.

### 3. *Diminution in Value of Property*

Pursuant to Paragraph 43 of the Proposed Second Amended Complaint, Plaintiffs seek damages regarding the diminution in the value and utility of Lots 4, 5, and 6 caused by changes in the regulation of residential development enacted since November 2000. These included: new requirements as of September 10, 2007 regarding site plan review for residential developments of lots greater than 5 acres (applicable to Lot 5) under the Zoning Code of the Village of Sagaponack; changes as of September 21, 2009 regarding the flood insurance rate map which

increased the required base height of structures that may be built; increases in the required coastal erosion hazard setback from 100 to 125 feet; and changes in the Suffolk County Department of Health Services' practices for approving sanitary systems for residences. Sec. Am. Compl. ¶ 43.

Defendants argue that they are not liable for damages related to the future use of these Lots since damages stemming from loss of value on future use are traditionally barred as too uncertain. *See* Defs.' Mem. at 8. To support this argument, Defendants rely on *Cohn v. Mezzacappa Bros., Inc.*, 155 A.D. 2d 506, 547 N.Y.S.2d 367 (2d Dep't 1989). In *Cohn*, the plaintiff sought leave to amend to add damages in addition to specific performance for alleged lost profits based on residential units plaintiff was plaining on constructing on the property at issue. *Cohn,* 155 A.D.2d at 507. To support this claim of damages, the plaintiff argued that during the pendency of the litigation over the contract of sale, the stock market crash in 1987 impaired the market value of new real estate construction which resulted in $5,000 of increased expenditures for advertising and promotion for the plaintiff. *Id.* The court, in holding that the allegations were insufficient as a matter of law to support the proposed amendment, quoted *Freidus* and held:

> Since the plaintiff remained in possession of the property throughout the period of her wrongful failure to convey, the defendant is entitled to the value of the use and occupancy of the property, i.e., its rental value, for that period. . . . The measure of the value of the use and occupancy is the rental value of the property, and not any profits which might be derived from its development (*see, Worrall v. Munn,* 38 NY 137, *supra*). In *Worrall*, the value of the property was predicated primarily, if not solely, upon its clay deposits, which the purchaser intended to use to make bricks for profit. Despite this prospective value, the Court of Appeals denied the purchaser damages for such lost profits and limited his recovery to the value of

> using the land as it was, which was minimal. Similarly here, while the primary value of the land in question may be for development, the profits which might be derived from such a future use do not constitute the present measure of damages.

*Freidus,* 123 A.D.2d. at 177. Although the Plaintiffs in the instant action identify the damages incurred as the diminution in the value and utility of the property, the alleged diminution hinges on a structure that did not exist and was not contracted to be built. Thus, Plaintiffs are really seeking damages for the alleged increase in property value they would have recognized if they had had the opportunity to construct a house before the regulations complained of were put in place. However, as stated in *Freidus*, "while the primary value of the land in question may be for development, the profits which might be derived from such a future use do not constitute the present measure of damages." *Id.*

Even accepting the damages claim as asserted by Plaintiffs, the Court finds that the damages cannot be proven to a reasonable degree of certainty. The Plaintiffs seek damages for the lost value of the Lots based on a structure or structures, not built or contracted to be built, pursuant to changes in residential development regulations – changes that do not carry any ascertainable value. For example, Plaintiffs allege that the value of the Lots decreased because new requirements regarding site plan review for residential developments over 5 acres were enacted. *See* Sec. Am. Compl. ¶ 43(b). Even assuming that such review is now more stringent, this new regulation, standing alone, has no identifiable monetary effect on the property at issue. The same can be said regarding Plaintiffs' allegations over changes in the practices for approving sanitary systems for residences. *See* Sec. Am. Compl. ¶ 43(e). The Plaintiffs fail to provide any information on what, if any, additional costs are now involved with regard to the approval

practices for residential sanitary systems.  Additionally, the fact that regulations were enacted that increased the base height of structures which may be built and set structures back an additional 25 feet from the coast (*see* Sec. Am. Compl. ¶ 43(d)) does not show with a reasonable degree of certainty that the value of the property decreased.

### 4.  *Attorneys' Fees*

Pursuant to Paragraph 44, Plaintiffs also allege damages in the form of their "reasonable attorneys' fees required to enforce their right to close title to Lots 4, 5 and 6 under the Contract of Sale." Sec. Am. Compl. ¶ 44.  The right to amend to assert attorneys' fees was not specifically addressed by either counsel.  The Court notes that Plaintiffs previously moved for attorneys' fees seeking the same relief which remains pending.  *See* DE 287.  As the claim for attorneys' fees sought by Plaintiffs with regard to closing title to Lots 4, 5 and 6 will be addressed in that motion, and as Plaintiffs did not allege these damages in the Amended Complaint, this Court respectfully recommends to Judge Hurley that this claim be denied as moot.

## V.  CONCLUSION

Since Plaintiffs' six additional specific performance claims would be futile, this Court respectfully recommends to Judge Hurley that leave to amend should be denied as to these claims.  Likewise, Plaintiffs' additional delay damages claims in construction costs and diminution in value of property would also be futile.  Consequently, this Court further recommends that leave to amend also be denied as to these claims.  However, this Court recommends that Plaintiffs be granted leave to amend in order to:  (1) add a claim for the lost rental value of Lots 5 and 6 in connection with the existing residences on such lots at the time of closing; (2) replace Defendant White Investment Realty, LP with White Investment Limited

23

Partnership; and (3) assert additional supporting facts as to their previously alleged claims, including their specific performance claim pursuant to the alleged right of first refusal as to Lot 1.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, any objections to this Report and Recommendation must be filed within fourteen (14) days of service. Each party has the right to respond to the other's objections within fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 6(a),(e), 72. All objections shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Denis R Hurley. Any request for an extension of time for filing objections must be directed to Judge Hurley prior to the expiration of the period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir.), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Central Islip, New York
      February 23, 2011

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge