UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
ANTHONY G. PETRELLO and CYNTHIA
A. PETRELLO,

      Plaintiffs,       **MEMORANDUM & ORDER**

   - against -        01-CV-3082 (DRH) (AKT)

JEFFERY G. WHITE,  as Co-Executor of the Estate
of John C. White, Jr., THOMAS D. WHITE, as
Co-Executor of the Estate of John C. White, Jr.,
and WHITE INVESTMENT LIMITED PARTNERSHIP,

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
**A P P E A R A N C E S :**

**For Plaintiffs:**

NICA B. STRUNK, PLLC
P.O. Box 5087
Southampton, NY 11969
By: Nica B. Strunk, Esq.

BERG & ANDROPHY
120 West 45th Street
New York, New York 10036
By: David H. Berg, Esq.

**For Defendants:**

McDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, New York 10173
By: Banks Brown, Esq.
   Monica Asher, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
By: John P. Coffey, Esq.
   Leah Friedman, Esq.

**HURLEY, Senior District Judge:**

This long-running controversy centers around an August 25, 1998 contract of sale (the "Contract") for 9.56 acres of waterfront property located in Sagaponeck, New York (referred to as lots 4, 5, and 6). That Contract also gave Plaintiffs a written right of first refusal over certain other parcels. Presently before the Court for resolution are cross motions for summary judgments on the issue of whether the November 28, 2000 transfer of title to the parcel known as Lot 1 triggered the right of first refusal granted to Plaintiffs. For the reasons set forth below, Plaintiffs' motion is granted and Defendants' motion is denied.

## FACTUAL BACKGROUND

The background of this litigation is contained in the various decisions issued by this Court, as well as the Second Circuit.[1] Set forth below are the facts relevant to the instant motions. Unless otherwise noted, the facts are undisputed. Other asserted disputed facts will be discussed as appropriate.

Plaintiffs Anthony G. Petrello and Cynthia A. Petrello ("Plaintiffs" or "Petrellos"), as purchasers, and defendant John C. White, Jr. ( "Defendant" or "White"), as seller, entered into a contract for the sale of Lots 4, 5, and 6 on the then-proposed Subdivision Map of John C. White Farm (the "Contract"). The fully signed Contract, dated "April 1998," was delivered to Plaintiffs on September 4, 1998. (Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 1.)

The Contract contains the following provision in paragraph 33(4) of the Rider:

---

[1] *See, e.g.,* 412 F. Supp. 2d 215(2006); 2007 WL 2276300 (Aug. 7, 2007); 2008 WL 5432230 (Dec. 30, 2008); 2009 WL 2346303 (June 9, 2010); 2011 WL 4793172 ( Feb. 23, 2011); 2011 WL 8198105 ( Mar. 03, 2011); 2011 WL 4628689 ( Sep. 30, 2011); 2012 WL 2803759 ( July 10, 2012);533 F.3d 110 (2008); 344 Fed. App'x 651 (2008); 507 Fed. App'x 76

>
> If Seller proposes to sell or otherwise transfer all or any portion of the Farm Property (the remaining property on the attached Map of White's Subdivision) to any third-party, then, prior to entering into such a transaction (or each such transaction in the event of periodic sales), Seller shall provide to Buyer a written copy of the proposed transaction and offer Buyer the opportunity within a thirty day period to match the transaction on the same terms and conditions. If Buyer declines, Seller shall be free to sell. If Seller proposes to sell or otherwise transfer all or any portion of the Farm Property to a related party, then this right of refusal shall not apply to such transfer, but the transferee shall be bound by the terms of this right of first refusal. Nothing herein shall preclude Seller from granting a conservation easement or transferring development rights associated with the Farm property without being subject to the right of first refusal.

(Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 2.) Paragraph 33(6) of the Contract Rider defines the terms "related party" and "third party" thusly:

> For purposes of paragraph 4 and 5 above, a third-party shall be any person or entity other than a "related party." A "related party" shall in the case of Seller refer to any of the following: (i) any person or group of persons who are descendants of John C. White, Jr. and Elizabeth J. White; (ii) any trust, at least ninety (90) percent of the value of which provides for beneficiaries who are the persons listed in (i); (iii) any general or limited partnership at least ninety (90) percent of the equity of which is owned by partners who are persons listed in (i); and (iv) any corporation or other limited liability entity at least ninety (90) percent of the shares are [sic] are owned by shareholder or owners who are listed in (i).

(Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 3.)

On November 28, 2000, White transferred to an entity entitled White Investment Realty, LP ("WIRLP") Lot 1 on the subdivision Map of the John C. White Farm ("Lot 1"). The "Recording Page" in the Suffolk County Clerk's Office indicates that zero consideration was paid by WIRLP for the transfer. Prior to that conveyance, White obtained an appraisal of Lot 1 which stated that the market value was $1,375,000.00 as of April 2000. The parties agree that, in

fact, WIRLP does not exist and the intended grantee was White Investment Limited Partnership ("WILP"). Accordingly, on July 8, 2010 a Correction Deed was executed stating that the intended grantee of the November 28, 2000 deed was WILP. (Defs.' Resp. to Pl.'s 56.1 Statement at ¶¶ 4-7.)

WILP was formed in the State of Delaware by certificate executed on September 3, 1998, and filed in the Office of the Secretary of State of the State of Delaware on September 17, 1998. The General Partners listed in the Certificate of Limited Partnership were: White, Elizabeth J. White (Defendant's wife), Jeffrey G. White (Defendant's son), Barbara J. White (Defendant's daughter) and Thomas D. White (Defendant's son). (Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 8.)

On December 23, 1999 the partners of WILP executed a document entitled "The White Investment Limited Partnership Agreement." Schedule A attached thereto lists the general and limited partners and their interest in the partnership as follows:

| General Partners: | Percentage Interest |
|---|---|
| John C. White | .485% |
| Elizabeth J. White | .485% |
| Jeffrey J. White | .01% |
| Barbara J. White | .01% |
| Thomas D. White | .01% |

| Limited Partners: | Percentage Interest |
|---|---|
| John C. White | 33.265% |
| Elizabeth J. White | 33.265% |
| Jeffrey J. White | 1.91% |
| Barbara J. White | 1.91% |
| Thomas D. White | 1.91% |
| The John N. White Irrevocable Trust | 1.91% |
| The White Family Trust | 24.83% |

(Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 9.)

On January 1, 2000, the partners of WILP executed an "Amendment and Restatement of Limited Partnership Agreement" wherein Defendant and Elizabeth J. White gratuitously transferred and assigned a portion of their interest in the partnership, resulting in the following partners and percentage interests:

| General Partners: | Percentage Interest |
|---|---|
| John C. White | .485% |
| Elizabeth J. White | .485% |
| Jeffrey J. White | .01% |
| Barbara J. White | .01% |
| Thomas D. White | .01% |

| Limited Partners: | Percentage Interest |
|---|---|
| John C. White | 17.03% |
| Elizabeth J. White | 17.03% |
| Jeffrey J. White | 3.82% |
| Barbara J. White | 3.82% |
| Thomas D. White | 3.82% |
| The John N. White Irrevocable Trust | 3.82% |
| The White Family Trust | 49.66% |

(Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 10.)

Under paragraph 36 (6)(iii) of the Rider to the Contract, the WILP would only qualify as a "related party" if it is a limited partnership "at least ninety percent of the equity of which is owned by partners who are persons listed in (i)", i.e. "descendants of [Defendant] and Elizabeth J. White." On November 28, 2000, the date of the transfer by Defendant of Lot 1 to WILP, (1) in excess of 17% of the equity of WILP was owned by Elizabeth J. White and (2) 49.66% of the equity of WILP owned by the White Family Trust ("WFT"). Defendants do not dispute that on the foregoing date Elizabeth J. White was not a person listed in paragraph 33(6)(i) of the Rider to the Contract because she was not a descendant of herself and Defendant. They contend,

however, that this was a mistake which requires reformation[2] of the contract.  Additionally, they

object to consideration of whether Elizabeth White is a "related party" as this was not raised in

the applicable pleading. With respect to the ownership interest of the White Family Trust,

Defendants assert that "the White Family Trust held a 25.06% interest *after* the transfer."

Specifically, "following" the transfer the ownership interest in WILP were as follows:

> John C. White, Jr.: 33.62%
> Betty White[[3]]: 33.62%
> Barbara White: 1.93%
> Jeffery White: 1.93%
> Thomas White: 1.93%
> John N. 1999 Irrevocable Trust: 1.92%
> White Family Trust: 25.06%

(Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 11-14 & Counterstatement 3.)

The White Family Trust Agreement was signed on September 29, 1999, by Defendant, as

Grantor, and Jeffery G. White, Michael Burrows and Robert C. Brewer, as Trustees. The

beneficiaries of the Trust are divided into two classes: (i) the "Issue Class," which consists of

"the Grantor's issue and any trust established for the benefit of the Grantor's issue"; and (ii) the

"Family and Close Family Friends Class," which consists of: "Kathleen Mary Sullivan White,

William Ord Brewer, Adrianne Allgeier Brewer, Alexander Allgeier Brewer, Katrina Lee

Brewer, Caroline Crimmins Daley, Michael Burrows, Alice Lee Arnold Brewer, Robert C.

Brewer, Matthew D. Burrows, Gwendolyn Brewer Rhawn, Catherine Brewer Daley and Judy

Miller Burrows." None of the foregoing members of the "Family and Close Friends Class" are

descendants of Defendant and Elizabeth J. White. (Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 16-

---

[2]Absent from the operative answer is any reference to "reformation." (*See* DE 402.)

[3] It would appear that "Betty White" refers to Defendant's wife, Elizabeth J. White.

17.)

White did not provide Plaintiffs a written copy of the proposed transaction with WIRLP and offer them the opportunity within a thirty day period to match the transaction on the same terms and conditions; Defendants assert no such notice was required. Plaintiffs maintain they were and are ready, willing, and able to purchase Lot 1 on the Subdivision Map for the sum of $1,375,000.00 or such other value as the Court may determine was the fair market value as of November 28, 2000. Plaintiffs are ready, willing and able to pay such purchase price in cash, and to close title within 30 days. (Defs.' Resp. to Pl.'s 56.1 Statement at ¶ 20, 22.)

Lot 1 is currently wholly-owned by WILP; there has been no transfer of Lot 1 since the 2000 transfer. However, WFT's interest in WILP was eliminated in 2006 and that interest was distributed directly to three of Defendant's and Elizabeth J. White's children and to a trust for the benefit of their fourth child. On July 8, 2010 at the closing of the transaction conveying Lots 4, 5, and 6 from White to the Petrellos, a Right of First Refusal Agreement was executed for Lot 1, affirming the existence of the right of first refusal on that lot but reserving the Petrellos' claim that the transfer of Lot 1 to WIRLP or WILP was in violation of paragraph 33(4) of the Rider to the Contract. (Ex. J to Asher Declar., dated Jan. 31, 2017.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing

law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried.  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary

judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id*. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II. The Parties' Contentions

Petrellos argue that WILP was not a related party as defined in the Rider to Contract on November 28, 2000, when it took title to Lot 1. First, Elizabeth J. White is not a descendent of herself and Defendant and she owned 17% of WILP. Second, on that date 46.99% was owned by the White Family Trust and it (or any trust) is not a descendant of Defendant and Elizabeth J. White. Also, the White Family Trust would not be a related party because 20% of its assets go to the "Family and Close Friends Class" upon the death of defendant and his wife Elizabeth. As the November 28, 2000 transfer was not to a related party, Petrellos continue, they are entitled to specific performance of the right of first refusal, or in the alternative, damages for its breach.

Defendants maintain that the 2000 transfer did not trigger the right of first refusal. With respect to Elizabeth J. White's interest in WILP, her omission was the result of a scrivener's error and the contract should be reformed on the ground of mutual mistake; additionally, this is a "new claim" that should be rejected as untimely. Nor was the right triggered because of the WFT, they posit, as the non-family beneficiaries of the WFT held less than a ten percent interest (applying IRS valuation methods) in WFT. Finally, Defendant proffer that Petrellos are not

entitled to the relief they seek because "*they are already in the same position* they were in before the 2000 transfer - Lot 1 is wholly-owned by a White related-party and the Petrellos hold a [right of first refusal] over that lot in case it is ever transferred to an unrelated party." (Defs.' Opp. Mem. at 20.)

### III.    Principles relating to Contract Interpretation  and Rights of First Refusal

"'[T]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569 (2002)).  "Typically, the best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.'" *Id.; see also Continental Ins. Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010) ("When interpreting a contract, the 'intention of the parties should control ...[, and] the best evidence of intent is the contract itself; if an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms.'") (quoting  *Hatalud v. Spellings*, 505 F.3d 139, 146 (2d Cir. 2007).  The analysis begins with the text of the contract because, under New York law, "a court must give full effect to unambiguous contract terms." *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012). That is, neither extrinsic evidence nor the parties' subjective intent operates to vary the terms of an unambiguous contract. *Id.* Put slightly differently, "the meaning of particular language found in [a contract] should be examined 'in light of the . . . purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes.' " *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (quoting

*Champion Int'l Corp. v. Continental Cas. Co.*, 546 F.2d 502, 505 (2d Cir. 1976)). Finally, "[w]hether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58–59 (2d Cir. 1994) (internal quotation marks omitted). "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985).

In general, a right of first refusal is "a restriction on the power of one party to sell without first making an offer of purchase to the other party upon the happening of a contingency: the owner's decision to sell to a third party." *LIN Broad. Corp. v. Metromedia, Inc.*, 74 N.Y.2d 54, 60, 544 N.Y.S.2d 316, 319 (1989); *see Lawrence v. Cohn*, 197 F. Supp. 2d 16, *Morrison v. Piper*, 77 N.Y.2d 165, 169–170, 565 N.Y.S.2d 444, 446 (1990). "The effect of a right of first refusal, also called a preemptive right, is to bind the party who desires to sell [or in this case "to sell or otherwise transfer"] *not to sell* [or, in this case, to sell or otherwise transfer] without first giving the other party the opportunity to purchase the property at the specified price." *LIN*, 74 N.Y.2d at 60, 544 N.Y.S.2d at 319.

## IV.    A Preliminary Matter

As part of their argument that the 2000 Transfer did not trigger the right of first refusal, defendants cite to events subsequent to the transfer. Specifically, they refer to the ownership interest in WILP following the 2000 transfer as well as the termination of WFT, sometime after November 2006, by a distribution of its assets.  While these matters may be of academic interest and of some possible relevance to the issue of remedy, the make-up of these entities after the

2000 transfer is not relevant to the issue of whether that 2000 transfer triggered the right of first refusal and accordingly shall not be considered on that issue.[4]

**V.     Did the November 2000 Transfer Trigger the Right of First Refusal**?

In determining whether the November 2000 transfer to WILP triggered the right of first refusal, the Court will first address the issues relating to Elizabeth's White ownership interest as a result of the transfer. It will then proceed to address the remaining issues vis a vis whether the November 2000 transfer triggered the Petrello's right of first refusal.

**A.     Elizabeth White's Interest in WILP**

To reiterate, Plaintiffs maintain that the transfer to WILP triggered the right of first refusal because as a result Elizabeth White held in excess of a 17% ownership interest in WILP and she is not a related party as defined by the Contract. Defendants' response is twofold: her omission was the result of a scrivener's error/mutual mistake and plaintiffs have waived this claim as it was not contained in the amended complaint and is being raised for the first time in the instant motions.

It would appear that the language of the right of first refusal excludes Elizabeth White as a related party as she is not a descendant of "John C. White Jr. and Elizabeth J. White" and only partnerships "at least ninety (90) percent of the equity of which is owned by partners who are" "descendants of John C. White Jr. and Elizabeth J. White" are included in the definition of

---

[4] Consistent with the Court's determination that the make-up of the various relative entities at any time other than the date of the 2000 transfer is not relevant to whether the 2000 transfer triggered Plaintiffs' right, many of the facts proffered in Defendants' 56.1 statement as undisputed regarding the current make-up of these entities are not included in the Court's recitation of the relevant facts.

related parties.[5] However, given Plaintiffs' failure to include Mrs. White's ownership as a trigger (1) when they amended their complaint on December 26, 2001 to add their claim about the ROFR on Lot 1; (2) when they further amended the complaint on July 31, 2012; or (3) in their pre-motion conference letter to this Court on July 17, 2016, this Court need not consider this new theory. *See Greenidge v. Allstate Inc. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (affirming district court decision not to reach the merits of new basis for bad faith claim where complaint made no reference to that basis); *accord Stapleton v. Barrett Crane Design & Eng'g*, – Fed. App'x –, 2018 WL 985775 (2d Cir. Feb. 20, 2018); *Lyman v. CSX Transp. Inc.*, 356 Fed. App'x 699, 701-02 (2d Cir. 2010).[6] As the Court declines to address this basis for Plaintiffs' motion, it is unnecessary to address Defendants' scrivener's error argument - although the Court notes Defendants failed to proffer any admissible evidence to support this assertion.[7]

---

[5] The Court notes parenthetically that this conclusion is supported not only by the plain, unambiguous language of the contract but by the allegation in a verified complaint filed by White against his former attorneys that "the right of first refusal contained in [the Contract] was negligently drawn in that it excluded Elizabeth J. White as a permitted transferee . . . ." (Ex. N. to Petrello Declar. at ¶ 41; *see id.* at ¶ 45 (stating that "Mrs. White was not included in the definition of 'related party' under the [Contract]").

[6] Plaintiffs maintain that the allegation in the Second Supplemental and Amended Complaint ("SSAC") that "On November 28, 2000, Defendant WILP did not constitute a 'related party' as defined in paragraph 33(6)" was sufficient under Fed. R. Civ. P 8 and that they were not required to spell out every one of the reasons why WILP was not a related party. (Pls.' Reply (DE 442) at 9. This argument might be somewhat more persuasive if the immediately preceding paragraphs did not allege that 46.99% of the equity of WILP was owned by the WFT and the WFT is not a descendant of John C. and Elizabeth J. White (SSAC ¶¶ 39, 40), and if they had referred to this argument in there pre-motion conference letter.

[7] Indeed, the only evidence presented on this issue is Mr. Petrello's sworn statement that to his knowledge White never proposed that his wife Elizabeth be included in the definition of related party. (*See* Petrello Decl. ¶19.)

### B.     WFT's Interest in WILP

At the time of the 2000 transfer of Lot 1, the WFT owned a 46.99% interest in WILP.  As defined in the Contract a partnership - whether general or limited - is a related person if "at least ninety percent of the equity of which is owned by partners who are the person listed in (i);" in other words, ninety percent of the equity must be owned by "any person or group of persons who are descendants of John C. White, Jr. and Elizabeth J. White."  As Plaintiffs accurately maintain, "[t]he White Family Trust (and indeed any trust by definition) is not a "descendent of John C. White, Jr. and Elizabeth J. White."

Defendants argue that in fact WFT was itself a related party:

> A trust is a related party under the ROFR if "at least ninety (90) percent of the value . . . provides for beneficiaries who are [descendants of Mr and Mrs. White]. The non-family member beneficiaries of WFT held a less than ten percent interest in WFT. WILP was a related party at the time of the 2000 Transfer because over ninety percent of its equity was owned by Mr. and Mrs. White and their descendants (some outright, and some in trust). It cannot be emphasized that the 2000 Transfer was intended to - and did - keep Lot 1 in the White Family.
> [In arguing that] a trust is not a "descendent" . . .[t]he Petrellos are . . . reading into the ROFR, the additional unwritten requirement that descendants must hold their partnership interest outright and cannot hold their interest in trust.

(Defs.' Mem. in Opp. (DE 441) at 18 (first set of brackets in original).)

It is, in fact Defendants who are adding an unwritten provision to the Contract's definition of related party.  Acceptance of their argument would require additional language, such as that set forth below in bold, to be added:

> A "related party" shall in the case of Seller refer to any of the following: (i) any person or group of persons who are descendants of John C. White, Jr. and Elizabeth J. White; (ii) any trust, at least

ninety (90) percent of the value of which provides for beneficiaries who are the persons listed in (i); (iii) any general or limited partnership at least ninety (90) percent of the equity of which is owned by partners who are persons listed in (i); and (iv) any corporation or other limited liability entity at least ninety (90) percent of the shares are [sic] are owned by shareholder or owners who are listed in (i)**; or any combination of (ii), (iii), or (iv) so long as ninety percent of the value is owned or for the benefit of person listed in (i).**

Even if the contract language did permit Defendant's interpretation, there is the problem of the inclusion of non-descendants of John C. and Elizabeth J. White, i.e. the members of the class of "Family and Close Family Friends." While defendants go to great lengths to minimize these beneficiaries of the WFT, the documentation submitted reveals that the Family and Close Friends beneficiaries owned a 20% interest in the Trust and had withdrawal and remainder rights. Defendants's assertion that these beneficiaries had a "Crummey Power" and that "[u]ntil the mid-1990s, trust settlors were loading up their trust with people who had a legal right to withdraw from the trust, but who they knew would never actually withdraw" (Defs.' Mem. in Opp. at n.4), is underwhelming in view of the concession that these Crummey beneficiaries "had a legal right to withdraw from the trust." (*Id.*; *id*. at 9 n.7.)

Acceptance of the assertion that a combination of descendants, trusts, partnerships, corporations, and/or limited liability entities can meet the Contract's definition of related party would also raise an issue that the Contract does not address: how the 90% interest is to be calculated when there is such a combination. Indeed, Defendants recognize that "there is no straightforward method for analyzing the interest in discretionary trusts such as WFT . . . ." ( Defs.'s Mem. in Opp. at 7 n. 5.) While Defendants use the IRS method for determining the values of life estates and remainders to calculate that the "non-family members" of WFT only

held an "8.8%" interest in Lot 1, they cite nothing in the Contract, or otherwise, to support that that is the appropriate valuation method.[8]

In sum, under the unambiguous language of the Contract WILP does not qualify as a "related" party and therefore the November 2000 transfer triggered the Petrello's right of first refusal.

## VI. The Issue of Relief

The threshold issue to be addressed regarding relief is whether any relief is appropriate. In this regard both sides rely on *Cipriano v. Glen Cove Lodge # 1458*, 1 N.Y.3d 53 (2003). An extended discussion of that case is therefore warranted.

*Cipriano* involved the rights and remedies of three parties: (1) Buffa, the holder of a right of first refusal; (2) Cipriano, the buyer of the property; and (3) the Glen Cove Lodge of the Order of Elks (the "Lodge"), the seller. While a recitation of the facts as to all three parties is necessary background, only the analysis of the right of first refusal is relevant and hence this Court's recitation of the *Cipriano* court's holding will be so limited.

In 1955, the Lodge entered into a stipulation with Buffa, who was selling a parcel of land to the Lodge, that gave Buffa a "'first option to re-purchase' the property at fair market value in the event the Lodge offered the premises for sale." *Id.* at 56. In October 1955, having received a bona fide offer to purchase the property, the Lodge extended Buffa the opportunity to exercise his right. Buffa declined but advised the Lodge "he wanted to keep his 'options open' should the

---

[8] Although not entirely clear, it appears that this 8.8% is calculated by using WFT's interest in WILP as 25.06%, its percentage of interest at some time following the November 2000 transfer rather than its 49.66% interest at the time of the transfer. (*See* Defs.' Mem. in Supp. (DE 432) at pp. 7-8 & n. 6.)

Lodge's deal fall through." *Id*. The Lodge advised Buffa twice in 1996 that it had received bona fide offers for the property and extended him the right of first refusal but in both instances he declined. In 1977 the Lodge began negotiations with Cipriano for the sale of the property and a contract of sale was entered into on July 2, 1999. The contract was not made contingent on Buffa waiving his right of first refusal; it did not even disclose the existence of that right. Nonetheless, Cipriano apparently had notice of Buffa's right of first refusal but was lead to believe that Buffa had waived it. However, Buffa had not waived it. The Lodge never extended Buffa an opportunity to exercise his right before signing the contract with Cipriano. Buffa did advise the Lodge of his claim and in a letter to the Lodge stated he was interested in exercising his purchase right and asked for a copy of the contract. The Lodge ignored the request and demanded to see a copy of the right of first refusal. Buffa sent a copy to the Lodge and again asked for a copy of the contract, which request the Lodge again ignored. Thereafter, the Lodge forwarded a copy of the right of first refusal to Cipriano and advised him that Buffa had not waived his rights. While the Lodge and Cipriano corresponded back and forth, Cipriano unsuccessfully negotiated with Buffa to buy out his right, delaying the closing. In late December 1999, the Lodge attempted to cancel the contract and returned Cipriano's down payment. Cipriano sent the check back, rejecting the Lodge's attempt at unilateral cancellation. In response, the Lodge set a time of the essence closing date and advised Cipriano that his failure to appear would entitled it to keep the down payment. Two days before the schedule closing, Cipriano informed the Lodge he was commencing an action to quiet title and did not intend to close. The Lodge treated this as an anticipatory breach and told Cipriano it was keeping the down payment. *Id*. at 56-58.

Cipriano commenced an action against both the Lodge and Buffa. In his answer, Buffa

counterclaimed against the Lodge, claiming it had violated his right of first refusal by contracting with Cipriano and seeking damages or specific performance of his right of first refusal. The trial court dismissed the counterclaim because the Lodge was not selling the property to Cipriano and had abandoned the transaction prior to its consummation. The Appellate Division upheld the dismissal of Buffa's counterclaim observing that "he had never exercised his right of repurchase." *Id*. at 59.

The New York Court of Appeals began its discussion of Buffa's right of first refusal by noting that in *LIN*[9] it had held that a contractual right of first refusal, which has been triggered by a contract to sell to a third party may not be exercised after the third party transaction had been abandoned as the grantor of the right is not obligated to keep the offer open for the specified duration of the right. It further noted that the Appellate Division had clarified that under *Lin* the holder of a right of first refusal may create a binding contract by exercising his right before the third-party contract expires. Consistent with these earlier decision, the *Cipriano* court noted that had Buffa been given the opportunity of his right of first refusal and not declined then either (1) Buffa would have a binding contract with the Lodge if he exercised his right before the Lodge-Cipriano transaction fell apart, or (2) Buffa's ability to exercise his right "would have evaporated" if he attempted to exercise it after the Lodge-Cipriano transaction was abandoned. *Id*. at 60. But an opportunity to exercise his right was never given to Buffa. Rather, noting that the Lodge ignored his requests for a copy of the contract, the court held that the Lodge's failure

---

[9] 74 N.Y.2d 54 (1989).

to act denied Buffa the opportunity to exercise his preemptive right to the property.[10] Turning

then to issue of remedy, the court wrote:

> Although the Lodge breached its contractual obligations to Buffa, on the unique facts before us, neither specific performance nor damages provides a satisfactory remedy for the Lodge's default. Specific performance—the principal remedy which Buffa has sought—is inapt when the relations between two parties as to the transfer of an interest in land have yet to ripen into a binding contractual agreement. Specific performance may be granted only where the holder of the right of first refusal is shown to be "ready, willing, and able to purchase the property, not only when the right ripens, but also when specific performance is ordered" (25 Williston, Contracts § 67:85, at 504 [4th ed.] ). Notwithstanding Buffa's letters to the Lodge or his effort to vindicate his right of first refusal through litigation, there is little in the record to support his assertion that he was ready, willing, and able to buy the property. If anything, his readiness to negotiate with Cipriano and waive his right of first refusal suggests that Buffa was less interested in buying the property than he was in selling his right. Given the haze of uncertainty surrounding Buffa's actual intent in the summer and fall of 1999, as well as the likely appreciation of the Lodge's property over the past four years, a grant of specific performance enabling Buffa to purchase the Lodge's property at the 1999 contract price could yield him a potential windfall.
>
> As an alternative to specific performance, Buffa seeks damages against the Lodge for breach of his right of first refusal. We conclude that an award of damages is not warranted under the unusual facts before us. Although the Lodge wrongfully deprived Buffa of an opportunity to exercise his right, Buffa suffered no injury as a result of the Lodge's breach. Buffa continues to hold the same right he held at the outset of the Lodge's initial 1998 negotiations with Cipriano. As in the past, Buffa can still invoke his right of first refusal against the offer of any future prospective purchaser. Moreover, he will still cast a cloud over the Lodge's title, and may seek compensation from potential buyers who want

---

[10] In so holding, the court rejected the argument that the Lodge was not required to answer his letters or provide him with the terms of the contract as Buffa already knew about the transaction with Cipriano, stating "[a] rightholder may be familiar with the broad contours of the grantor's transaction with a third party, but may nevertheless be handicapped in exercising the right when there is no specific offer from the grantor." *Id*. 60-61.

> him to waive his right. Because the Lodge caused no appreciable
> injury to Buffa, no damages can flow from its breach.

*Id*. at 61-62.

Plaintiffs emphasize the *Cipriano* court's holding that when the grantor of a right of first refusal breaches his obligation by entering into a contract to sell without giving prior notice to the holder of the right, the holder is entitled to specific performance upon a proper evidentiary showing that he was and is ready, willing, and able to so purchase the property on the same terms. (Pls.' Mem. at 10-11.) Defendants, on the other hand, point to the court's holding that although the Lodge had breached its contractual obligation "neither specific performance nor damages provides a satisfactory remedy for the Lodge's default" and its statements that granting specific performance to Buffa "could yield him a potential windfall" and that he remained in the same position as prior to the breach. (Defs.' Opp. at 18.)

Firstly, the *Cipriano* court's denial of specific performance must be viewed in the context of the "unique facts" of that case. Here, unlike in *Cipriano*, the transaction did not fall through; Lot 1 was in fact transferred to a third party. Moreover, Plaintiffs in this case complied with all their contractual obligations and have made an unchallenged evidentiary showing that they were ready, willing and able to purchase Lot in November 2000 and remain so today. This is in contrast to Buffa whose actions the court characterized as "suggest[ing] he was less interested in buying the property than he was in selling his right." In the absence of such unique facts, the courts of New York hold that, as a rule, the remedy of specific performance should be awarded in contract action involving real property on the premise that each parcel is unique. *See Da Silva v. Musso,* 53 N.Y.2d 543 (1981); *EMF Gen. Constr. Corp. v. Brisbee*, 6 A.D. 3d 45, 52 (1st Dept.

2004). Accordingly, here, unlike in *Cipriano*, the holders of the right of first refusal are entitled to specific performance. *See Cortese v. Connors*, 1 N.Y.2d 265 (1956) (granting specific performance of right of first refusal); *H.G. Fabric Discount, Inc. v. Murray Pomerantz*, 130 A.D.2d 712 (2d Dept. 1987) (same).

Additionally, the Court is underwhelmed by Defendants' argument that granting specific performance would yield Plaintiffs a windfall. Plaintiffs are willing to pay the appraised value of Lot 1 as of the date it was transferred, i.e., November 2000. That the property has appreciated since that date should not prevent specific performance. *See Da Silva*, 53 N.Y.2d at 550. This is especially true given Defendants' course of conduct. As detailed in earlier opinions in this matter, Plaintiffs have complied with all their obligation under the Contract, whereas Defendants have not. Indeed, it seems that the decision to transfer Lot 1 to WILP was made at the same time that the Whites refused to sign the closing documents for Lots 4, 5, and 6 which refusal lead to the institution of this litigation. (*See* Petrello Declar. (DE 435) at ¶¶ 10-13.)[11] Also relevant is that Plaintiffs did not sit on their rights but, having learned of the transfer through a title search, amended their complaint back in December 2001 to assert the claim for specific performance of their right of first refusal on Lot 1. (*See id*. at ¶ 24.)

Finally, contrary to Defendants' assertion, Plaintiffs have been damaged. Had White complied with his obligations under the contract and its right of first refusal provision, Plaintiffs would have been able to purchase lot 1 in 2000 and would have had the benefit of enjoying that property for the more than a dozen ensuing years.

---

[11] This contradicts Defendants' unsupported assertion that the 2000 transfer was an unintentional breach of Defendants' right.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment on their claim for breach of their right of first refusal on Lot 1 is granted to the extent that they are entitled to Lot 1 for the fair market value of that lot as of November 29, 2000 (i.e., $1,375,000.00) and Defendants' motion for summary judgment dismissing the claim for breach of the right of first refusal on Lot 1 is denied. No judgment shall issue at the present time given that there remain other claims pending in this matter.

**SO ORDERED.**

Dated: Central Islip, New York
      March 8, 2018                          _s/ Denis R. Hurley_____
                                              Denis. R. Hurley
                                              United States District Judge